**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 16a0217n.06**

**No. 15-5499**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Apr 21, 2016 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| GERALD GIBBS, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

**BEFORE:**     SUTTON and GRIFFIN, Circuit Judges; and OLIVER, District Judge.[*]

**OLIVER, District Judge.** Defendant-Appellant Gerald Gibbs ("Gibbs") appeals his sentence of eighty-seven months' imprisonment for conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1). He asserts that the district court committed error by enhancing his sentence for possession of a firearm and for his leadership role in the conspiracy, incorrectly determining the amount of cocaine attributable to him, and denying his request for certain discovery from other criminal cases. For the following reasons, we **AFFIRM** the sentence imposed by the district court.

**I. PROCEDURAL HISTORY**

Gibbs was indicted in the United States District Court for the Eastern District of Kentucky, along with two other co-defendants, William Slater ("Slater") and Randy Kirk

---

[*]The Honorable Solomon Oliver, Jr., Chief Judge, United States District Court for the Northern District of Ohio, sitting by designation.

("Kirk"), for conspiracy to distribute and possess with intent to distribute cocaine from about January 2014 to on or about April 8, 2014. (R. 21.) Gibbs was also charged in that same Indictment with being a felon in possession of a firearm pursuant to 18 U.S.C. § 922(g)(1). (*Id.*) Ultimately, Gibbs entered a plea of guilty to the charge of conspiracy without a written plea agreement. (R. 60.) The government agreed to a dismissal of the felon in possession charge and the court dismissed it. (*Id.*)

The Presentence Investigation Report ("PSR" or the "Report") recommended to the court that it find Gibbs to have a Total Offense Level of 27 under the U.S. Sentencing Guidelines. (Gibbs PSR, ID 492 ¶28.) The PSR arrived at this recommendation by determining that Gibbs's Base Offense Level was 26 because Gibbs was responsible for at least two, but less than three and a half, kilograms of cocaine; a two-level enhancement because Gibbs possessed a dangerous weapon or firearm; and another two-level enhancement because Gibbs was an organizer, leader or supervisor of at least two others involved in the conspiracy. (*Id.* at 491-92 ¶¶ 20-26.) This resulted in an Adjusted Offense Level of 30, which the PSR recommended be reduced by three levels for Acceptance of Responsibility. (*Id.* at 492 ¶ 27.) The PSR found Gibbs to be in Criminal History Category III. (*Id.* at 494 ¶ 37.) A Total Offense Level of 27 and a Criminal History Category of III results in a guidelines range of 87 to 108 months. (*Id.* at 497 ¶ 61.) Gibbs lodged objections to the drug quantity determination and each of the proposed enhancements. Both Gibbs and the United States filed a sentencing memorandum, and Gibbs filed a supplemental sentencing memorandum. After a hearing on the record, at which live testimony was taken, the district court overruled all of Gibbs's objections to the PSR and sentenced him to 87 months, the low end of the guidelines range. (R. 145, ID 778.) Thereafter, Gibbs filed the within appeal.

## II. FACTUAL BACKGROUND

In June 2013, the Drug Enforcement Agency ("DEA") and the Maysville, Kentucky Police Department began a community-wide investigation into drug trafficking in Maysville, which culminated in April 2014. (R. 145, ID 572-73.) According to Agent Andy Muse ("Agent Muse"), a Kenton County police officer who was assigned to the DEA Task Force ("Task Force"), the initial target of the investigation was an individual who later became a confidential informant for the Task Force in March 2014. (*Id.* at 576.) This individual was not indicted as part of the conspiracy for which Gibbs was charged. The Task Force arranged some controlled buys of crack cocaine and small amounts of heroin from this individual. (*Id.* at 576-77.) In addition to controlled buys, the agents used a number of other techniques in their investigation, including surveillance, pen registers, trap and traces, GPS tracking, pole cameras, and ultimately court-authorized wiretapping of the individual's phone near the end of 2013. (*Id.* at 577- 578.) The wiretap was in place for sixty days. (R. 145, ID 578.) Thereafter, the Task Force obtained authorization to wiretap Gibbs's phone, which they started in February of 2013. (*Id.* at 579.)

Agent Muse also testified at sentencing that, on March 6, 2014, the Task Force confronted the individual who had been the initial target of the Maysville investigation, and he agreed to cooperate with them by being a confidential informant and making controlled buys from other individuals, including Gibbs. (*Id.* at 579-80.) Moreover, Agent Muse indicated that the confidential informant told him during the March 6, 2014 interview, that he had known Gibbs since they were children, as they grew up in the same area. (*Id.* at 581.) According to Agent Muse, the confidential informant further stated that he "would go and pick up cocaine for [Gibbs], anywhere between two and four and a half ounces at a time." (*Id.* at 582.) He indicated this would "happen sometimes two to four times a month", and that this had been happening for

a few years. (*Id.* at 582-83.) However, Agent Muse clarified his testimony regarding the informant's statement by agreeing with the Assistant United States Attorney who questioned him at sentencing whether the confidential informant "would assist Mr. Gibbs in getting this two to four and a half ounces two to four times a month when Mr. Gibbs's other source or sources were unable to come through." (R. 145, ID 583.)

According to Agent Muse, the confidential informant also recounted a couple of instances in January 2014, where he discussed obtaining, and sometimes in fact obtained, cocaine for Gibbs. (*Id.* at 586-97.) Agent Muse indicated that the Task Force was able to verify that these events actually happened through surveillance or by listening to phone calls, via wiretaps, between the confidential informant and Gibbs as events were unfolding. (*Id.*) In one incident, which took place on January 11, 2014, Gibbs notified the confidential informant that he would like to obtain between four to nine ounces of cocaine. (*Id.* at 586-88.) Thereafter, Gibbs, the confidential informant and Gibbs's brother-in-law sought cocaine from a local source, but were ultimately not able to connect with the source. (*Id.* at 588-90.) Then, they went to Cincinnati to obtain drugs from a different source. (*Id.* at 590.) While they did obtain drugs from the Cincinnati source, they were able to obtain only one and a half ounces of cocaine. (R. 145, ID 590.) Agent Muse recounted that the confidential informant also provided information regarding another occasion, on January 16, 2014, when he was involved in obtaining cocaine for Gibbs. (*Id.* at 591.) After receiving an order for four and a half ounces of cocaine from Gibbs, the confidential informant traveled with Kirk, one of the co-conspirators indicted with Gibbs, to the Dayton area to purchase the cocaine. (*Id.* at 592-94.) Upon returning to Maysville, the confidential informant dropped Kirk off at his car and then went over to Gibbs's house. (*Id.* at

4

594.)  Later, during a telephone or text communication with the confidential informant, Gibbs expressed displeasure with the weight of the drugs, indicating it was "a little off." (*Id.* at 595.)

Agent Muse also testified at sentencing regarding an April 8, 2014 post-arrest interview with Slater, the other co-defendant, wherein Slater indicated that in January 2014, he obtained one and a half ounces of cocaine from Gibbs to make into crack, and further indicated that the proceeds from the sale of the crack would go back to Gibbs. (*Id.* at 598-99.)  Agent Muse also testified that, on March 30, 2014, after the confidential informant had been working for the DEA, he went over to Gibbs's house, equipped with a recording device, which enabled Agent Muse to overhear their conversation. (R. 145, ID 601-603.)  Gibbs and the informant discussed calling a source regarding the sale of Gibbs's Camaro automobile for $28,000.  (*Id.* at 604-05.)  Thereafter, the informant called the source at Gibbs's request.  When negotiations were underway, Gibbs got on the line. (*Id.* at 606.)  After the source requested photos of the vehicle, Gibbs offered to sell the Camaro for $25,000. (*Id.*)  According to Agent Muse, the conversation involved making a trade for some money and some "work." (*Id.*)  Knowing that the person on the other end of the line was a source, Agent Muse understood "work" to mean drugs. (*Id.*)  It was undisputed that the vehicle was ultimately not sold to the source for either money or drugs. (*Id.* at 606-07.)  It was also undisputed that if the car had been sold or exchanged for between $25,000 and $30,000, that amount would be sufficient to purchase about a kilogram of cocaine, or 2.2 pounds.  (R. 145 ID 607.)

The fifth and last event discussed by Agent Muse relative to Gibbs's drug activity occurred on April 8, 2014. (*Id.* at 572-76, 693-93.)  According to Agent Muse, Gibbs initiated a conversation with the confidential informant about obtaining cocaine.  (*Id.* at 573.)  The confidential informant was to go up to Dayton, where he had a source, and obtain the cocaine.

(*Id.*) Gibbs also instructed the informant to contact Slater to obtain money for the purchase and to deliver the drugs to Slater once they had been obtained. (*Id.* at 574.) Ultimately, the confidential informant and Slater had a disagreement, after which Slater refused to provide the money. (R. 145 ID 574.) After informing Gibbs that Slater would not provide money for the purchase, the confidential informant, nevertheless, bought the four and a half ounces of cocaine for Slater and Gibbs with the understanding that he would receive his money back on delivery. (*Id.*) The informant did purchase the cocaine and brought it back for delivery to Slater at which point Slater was arrested. (*Id.* at 575-76.)

At sentencing, the district court, after reviewing all the evidence, overruled Gibbs's objection to the drug quantity amount recommended by the PSR, finding that there would be no changes to the guidelines recommended in the PSR. (R. 145, ID 767-68.) The district court also overruled Gibbs's objections to the two-point enhancements for possession of a firearm and for Gibbs's leader/organizer role in the conspiracy. (*Id.* at 752, 757.)

## III. LAW AND ANALYSIS

### A. Firearm Sentencing Enhancement Under Section 2D1.1(b)(1)

We first address whether the district court erred in applying a two-level firearm enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) to his base offense level. We review the district court's factual finding that a defendant possessed a firearm during a drug crime under the clearly erroneous standard of review. *United States v. Benson*, 591 F.3d 491, 504 (6th Cir. 2010). However, where the "factual findings of the district court are not challenged, and only the application of those facts as to the Guidelines is challenged, then our review is de novo." *Id.* (citing *United States v. Chalkias*, 971 F.2d 1206, 1216 n.12 (6th Cir. 1992)).

Section 2D1.1(b)(1) of the Guidelines instructs that "[i]f a dangerous weapon (including a firearm) was possessed, increase by 2 levels." U.S. Sentencing Guidelines Manual § 2D1.1; *see also United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) (alteration in original). The burden is on the government to "establish[ ] by a preponderance of the evidence that [ ] the defendant actually or constructively possessed the weapon." *Id.* at 606 (internal quotations omitted; citation omitted). The government also must establish by a preponderance of the evidence that "the dangerous weapon [was] possessed during 'relevant conduct.'" *United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012) (citing *United States v. Faison*, 339 F.3d 518, 520 (6th Cir. 2003)) (alteration in original) (noting that "[t]his Court has previously recognized that the 1991 amendments to the Sentencing Guidelines removed the requirement that the weapon be possessed *during the commission of the crime*."). If "the government meets its burden, a [rebuttable] presumption arises that the weapon was connected to the [relevant conduct]." *Id.* (internal quotations omitted; citation omitted). Thereafter, "[t]he burden then 'shifts to the defendant to show that it was 'clearly improbable' that the weapon was connected to the [relevant conduct].'" *Id.* (citing *Catalan*, 499 F.3d at 606). Where the defendant fails to meet this burden, "the district court should apply the enhancement." *Catalan*, 499 F.3d at 606-07 (citing *United States v. Shults*, 68 F. App'x 648, 653 (6th Cir. 2003)).

In this case, Agent Muse testified that he overheard a conversation, which was intercepted by wiretap on the informant's telephone (between Gibbs and the informant on January 9, 2014), where Gibbs inquired about obtaining a pistol. (R. 145, ID 601-02.) Agent Muse also recounted another conversation that Gibbs had with the informant about a gun when the informant visited Gibbs's home on March 30, 2014. (*Id.* at 602) Because the informant was wearing a recording device, that conversation could be overheard by Agent Muse. (*Id.* at 602-

03.)  Gibbs showed the confidential informant two firearms, a "Desert Eagle" and a "Glock," and Agent Muse heard Gibbs "racking" a firearm.  (*Id.* 603.)  He also heard Gibbs say that he had "them" for protection.  (*Id.*)

Although no drugs were observed by the informant during his visit, counsel for the government argued at sentencing that the two-level enhancement for possession of a firearm was warranted, stating:

> So I agree there is no evidence before the Court that on March 30, 2014, that the defendant was simultaneously in possession of cocaine for distribution and firearms. What you have are two different pieces that I think, when combined, are still sufficient.
>
> You have his admissions to the [confidential informant] that he had those firearms for his protection with the context of that conversation being that he is trafficking in cocaine. And then you have the previous deals in January, where you have . . . deliveries of cocaine for further distribution made to the house.

(R. 145, ID 750.)

The court concluded that the government had met its burden of showing that the weapon was possessed during the relevant period.  (*Id.* 188-90.)  Thereafter, it found that Gibbs had not met his burden of showing it was "clearly improbable" that the weapons were connected to the offense.  (*Id.*)  Acknowledging the fact that many people in Kentucky use firearms for protection, the court concluded:

> I simply think that given the defendant's statement that he possessed the firearm for protection, protection from what? Well, is it probable – is it clearly improbable that the firearm on the 30th was connected with the offense? I can't say that it's clearly improbable.

 (*Id.* at 189) The court went on to say, "So the protection of drugs and/or drug proceeds is just as much a–what word am I looking for? Is just as probable as the protection of him and his family."  (*Id.*)

We affirm the ruling of the district court. While this is not the strongest case for an enhancement under § 2D1.1(b)(1), we cannot find that the district court erred in applying the two-level firearm enhancement. Gibbs stipulated to possession of the two firearms, thus satisfying the government's burden to establish that he possessed weapons. (R. 145, ID 744.) With respect to the connection between Gibbs's possession and the relevant conduct, there is evidence that Gibbs was involved in the drug trade, and on some occasions, drugs were present in his house. (*Id.* at 590, 594-95.) Further, Agent Muse's testimony reflects, that in one conversation, Gibbs told the confidential informant that he wanted a pistol, and in a later conversation Gibbs stated that he used the guns for his protection. (*Id.* at 603.) Although Gibbs maintains that the guns were protection of his family, not drugs or drug proceeds, this assertion does not establish that it was "clearly improbable" that firearms and the guns were connected to the relevant conduct. *See United States v. Wheaton*, 517 F.3d 350, 368 (6th Cir. 2008) (concluding that defendant's counsel's "bare assertion" that "the gun might simply have been for the lawful purpose of defending the residence is insufficient to sustain [the defendant's] burden of showing that it was 'clearly improbable' that the gun was related to the drug conspiracy." ). Moreover, the fact that the firearms were "not in the same vicinity" as the drugs, as Gibbs argues, does not change our conclusion because firearms need not be in the same location as the drugs for § 2D1.1(b)(1) to apply. *See id.* (noting that guns and drugs do not need to be in the same location for § 2D1.1(b)(1) to apply); *United States v. Branham*, 460 F. App'x 538, 544 (6th Cir. 2012) (finding that the district court did not err in applying the firearm enhancement even where defendants had not stored the drugs and firearms in the same location). Based on these facts, the district court properly concluded that the defendant failed to meet his burden in

showing that it was "clearly improbable" that the firearms were connected to the relevant conduct.

## B. Leader/Organizer Sentencing Enhancement Under Section 3B1.1

We next address whether the district court erred by applying the leadership enhancement pursuant to § 3B1.1(c) of the Guidelines. Ordinarily, "legal conclusions are reviewed de novo and factual findings are reviewed for clear error." *United States v. Washington*, 715 F.3d 975, 982 (6th Cir. 2013) (citation omitted). However, following the Supreme Court's holding in *Buford v. United States*, 532 U.S. 59 (2001), this Circuit held that "under the reasoning in *Buford*," review of a district court's legal conclusion that a person is a "leader" of a conspiracy under § 3B1.1 "is also deferential." *Washington*, 715 F.3d at 983.

Section 3B1.1, in relevant part, instructs that, "[b]ased on the defendant's role in the offense," the court shall increase the offense level by two levels where "the defendant was an organizer, leader, manager, or supervisor in any criminal activity," other than that described in § 3B1.1(a) or (b). To qualify for an enhancement under § 3B1.1, "[a] defendant only needs to be a leader of 'one or more other participants.'" *Washington*, 715 F.3d at 983 (quoting U.S. Sentencing Guidelines Manual § 3B1.1 cmt. n.2). To determine whether an enhancement under § 3B1.1 applies, the court considers the following factors:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*United States v. Castilla-Lugo*, 699 F.3d 454, 460 (6th Cir. 2012) (quoting U.S. Sentencing Guidelines Manual § 3B1.1 cmt. n.4 (2011)). While the district court considers the aforementioned factors to determine whether the enhancement applies, it "need not find each

factor in order to warrant an enhancement." *Id.* (citing *United States v. Gates*, 461 F.3d 703, 709 (6th Cir. 2006)).

Gibbs argues that, although he was involved in drug trafficking, he did not play a leadership or organizational role. However, the record indicates that Gibbs not only directed the confidential informant to make drug purchases, he also directed co-defendant Slater. For example, with respect to the April 8, 2014 transaction, the district court found that, while working in northern Ohio, Gibbs directed the confidential informant to purchase cocaine from a source located in Dayton, Ohio, and obtain from Slater the money necessary to purchase the drugs. (R. 145, ID 756.) Moreover, based on Agent Muse's testimony at sentencing regarding Slater's April 8, 2014 post-arrest interview, the court found that Gibbs directed Slater to cook powder cocaine into crack cocaine and provided Slater with the one and a half ounces of powder cocaine with which to do so. (*Id.* 599, 756 )

We have previously noted that "[t]he trial judge is most familiar with the facts and is best situated to determine whether someone is or is not a 'leader' of a conspiracy that the jury found existed. Deferring to this advantage is appropriate." *Washington*, 715 F.3d at 983. Based on these facts, we conclude that the district court did not err in applying a two-level enhancement to Gibbs's Base Offense Level based on Gibbs being a leader of one or more participants in the conspiracy. Accordingly, we defer to the district court's conclusion.

## C. Calculation of Drug Quantity for Sentencing

We next address whether the district court erred in attributing to Gibbs at least two, but not more than three and a half, kilograms of cocaine. We review the district court's factual finding as to the quantity of drugs attributable to the defendant for clear error. *United States v. Russell*, 595 F.3d 633, 646 (6th Cir. 2010) (citing *United States v. Walton*, 908 F.2d 1289, 1300-

01 (6th Cir. 1990)). We have noted that "[a] factual finding is clearly erroneous where, although there is evidence to support that finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. Ware*, 282 F.3d 902, 907 (6th Cir. 2002)) (internal quotations omitted); *see also United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008) ("Clear error will not be found where two permissible views of the evidence exist." (citing *Anderson v. City of Bessemer*, 470 U.S. 564, 573-74 (1985))). Moreover, "[i]f the exact amount of drugs is undetermined, an estimate will suffice, but . . . a preponderance of the evidence must support the estimate." *Jeross*, 521 F.3d at 570 (quoting *Walton*, 908 F.2d at 1302) (internal quotations omitted; alteration in original).

At sentencing, the government argued that, based on a "conservative estimate," Gibbs was responsible for obtaining for distribution at least two, twenty-four gram ounces, twice a month over a period of two years, which, based on the government's calculation, surpassed the "two kilogram threshold" recommended in the PSR. (R. 145, ID 759.) In reaching this amount, the government relied almost exclusively on Agent Muse's testimony regarding the confidential informant's March 6, 2014 interview statement that Gibbs obtained anywhere between two and four and a half ounces of cocaine, two to four times per month, over a two-year period. (*Id.* at 758, 582.) However, based on Agent Muse's testimony, it is clear that the confidential informant was not responsible for all of these transactions; rather, the confidential informant only served as a source of cocaine for Gibbs when Gibbs's other sources were unable to supply him. (*Id.* 583, 758.) Further, the government argued that five drug transactions, occurring between January and April of 2014, as detailed by the confidential informant and verified by Agent Muse, corroborated the confidential informant's information as to the quantity of cocaine Gibbs obtained for distribution. (*Id.* at 759.) Specifically, while some of the transactions between

January and April of 2014 were not effectuated, the record reflects several instances where Gibbs contacted the confidential informant about obtaining between four and nine ounces of cocaine. (R. 145 ID 572-76, 586-97, 604-05.)   The government's argument is consistent with the recommendation of the PSR, which concluded that the drug quantity attributable to Gibbs was two to three and a half kilograms of cocaine.  (Gibbs PSR, ID 490 ¶ 15.)

Based on a review of the record, it is apparent that the district court found the government's argument persuasive.  Ultimately, the court concluded that, "what happened in January, February, March, April, those transactions corroborate what happened before, in the Court's view.  So the Court finds that conservatively, the quantity of cocaine that was recommended by the probation officer in her presentence report was accurate by a preponderance of the evidence."  (R. 145, ID 768.)  Thus, the district court overruled Gibbs's objection as to the drug quantity calculation.  (*Id*.)  Central to the court's conclusion was the fact that several of the buys occurring between January and April of 2014, which were recorded and/or surveilled, "provide[d] indicia of trustworthiness and reliability" sufficient to support a finding that Gibbs obtained between two and four and a half ounces of cocaine per month, over a period of several years.  (*Id.* at 765.)  The court went on to explain the following:

> I have to err on the side of caution.  We have, in January of 2014, a situation where there was a negotiated amount of nine ounces . . . .
>
> The fact that they got less, one and a half ounces is what they got, they negotiated for nine.  The nine amount is the amount you include, not the one and a half.  If I'm negotiating with somebody and I want to get nine but only get one and a half, my intention was to get nine.
>
> Same thing on January 16, 2014.  Four and a half ounces negotiated.  Two days later, there was more that was sought by the defendant, as evidenced by those line sheets.
>
> February of 2014, they looked for some dope from another source.  Nothing obtained.  What that does is it corroborates the informant's statement that they

13

> were looking at getting dope every other week, in essence. The fact that they didn't get any that time doesn't dissuade the Court from not finding that the informant was otherwise believable.
>
> This Camaro situation. I don't think it's necessary for the Court to find that the entire amount was going to be traded for dope. There certainly was discussion. The defendant asked the CI to contact his source of supply to see if he could sell or trade his car for money or work . . . . That's not a common drug code for dope, work, but that's what the source of supply was in the business of doing, selling dope.

(R. 145, ID 766-67.) Additionally, the court indicated that statements made by Slater, following his arrest on April 8, 2014, further supported the confidential informant's statements regarding the amount of cocaine that Gibbs obtained per month, over a two-year period, for distribution. (*Id.* at 766.)

It appears that only three out of the five transactions occurring between January and April of 2014 were successful, and that those transactions only amounted to ten and a half ounces of cocaine. (R. 145, ID 575, 594, 591.) However, "[t]he district court's estimate may be based upon physical evidence (such as seized drugs) or testimonial evidence," including that of a coconspirator, as in this case. *Jeross*, 521 F.3d at 570 (citing *United States v. Pruitt*, 156 F.3d 638, 647 (6th Cir. 1998)). Moreover, the district court's finding that the relevant conduct included Gibbs's drug activity over a two-year period—thus, outside of the scope of conduct charged in the Indictment—does not render the calculation clearly erroneous. If relevant, "[u]ncharged conduct may be considered in calculating the sentencing range under the Sentencing Guidelines." *United States v. Gill*, 348 F.3d 147, 153 (6th Cir. 2003) (citation omitted); *see also United States v. Vu*, 622 F. App'x 481, 482-83 (6th Cir. 2015). Moreover, in drug trafficking cases, relevant conduct includes "'all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" *Gill*, 348 F.3d at 152 (citing U.S. Sentencing Guidelines Manual §§ 1B1.3(a), 3D1.2(d)); *see also Vu*, 622 F.

14

App'x at 482-83 (citation omitted); *United States v. Easley*, 306 F. App'x 993, 995 (6th Cir. 2009) (noting that prior drug transactions may be considered if they are "'substantially connected' to the offense of conviction 'by at least one common factor, such as . . . common accomplices, common purpose, or similar modus operandi'" (citing U.S. Sentencing Guidelines Manual § 1B1.3 n.9(A))).

Gibbs relies on *United States v. Hill*, 79 F.3d 1477 (6th Cir. 1996), to establish that the historical drug transactions between Gibbs, the confidential informant, Kirk and Slater, were "too remote in time" to constitute relevant conduct. (Appellant Br. at 23.) However, *Hill* is distinguishable. In *Hill*, the court concluded that a nineteen-month lapse between the two drug transactions and the complete absence of regularity, constituted an "extremely weak" temporal proximity. 79 F.3d at 1484. Here, unlike in *Hill*, the district court based Gibbs's relevant conduct on evidence suggesting that for a period of at least two years, Gibbs obtained anywhere from two to four and a half ounces of cocaine several times per month. (R. 145, ID 765-68.) Based on these facts, we cannot conclude that the district court's drug quantity determination was clearly erroneous.

## D. Discovery from other Criminal Cases

Gibbs last argues that the district court deprived him of his right to a fair hearing by denying him certain discovery from other criminal cases involving the confidential informant. We review a district court's evidentiary determination for abuse of discretion. *United States v. Semrau*, 693 F.3d 510, 529 (6th Cir. 2012) (citing *United States v. Richards*, 659 F.3d 527, 543 (6th Cir. 2011)). Federal Rule of Criminal Procedure 16 instructs that, "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy" evidence within the government's "possession, custody, or control," which is "material to preparing the defense."

Fed. R. Crim. P. 16(a)(1)(E). To satisfy the Rule, a defendant "must make a *prima facie* showing of materiality." *United States v. Lykins*, 428 F. App'x 621, 624 (6th Cir. 2011) (unpublished) (citing *United States v. Phillip*, 948 F.2d 241, 250 (6th Cir. 1991)). Clarifying the rule's application, "the Supreme Court concluded that 'defense' means a 'defendant's response to the Government's case in chief.'" *United States v. Robinson*, 503 F.3d 522, 531 (6th Cir. 2007) (quoting *United States v. Armstrong*, 517 U.S. 456, 462 (1996)). In other words, Rule 16 "applies only to 'shield' claims that 'refute the Government's arguments that the defendant committed the crime charged.'" *Semrau*, 693 F.3d at 529 (quoting *Robinson*, 503 F.3d at 532); *see also Lykins*, 428 F. App'x at 624 ("In assessing materiality, we consider the logical relationship between the information withheld and the issues in the case, as well as the importance of the information in light of the evidence as a whole.").

Here, Gibbs fails to carry his burden in establishing that the requested discovery was material to his defense. The court found during sentencing, and the government maintains in its brief, that it did not intend to call, as witnesses in its case-in-chief, any of the fourteen defendants indicted in separate cases in regard to which Gibbs sought discovery. (R. 145, ID 638; Appellee Br. at 23-24.) Moreover, the record reflects that none of the controlled buys, between the confidential informant and the defendants in separate cases, involved Gibbs. (R. 145, ID 637.) Furthermore, "[r]equests for discovery fall outside the scope of [Rule 16] if a defendant is 'not seeking the discovery to aid in the preparation of his defense,' but is 'attempting to obtain the discovery for the purpose of gathering materials to support various sentencing arguments.'" *United States v. Pirosko*, 787 F.3d 358, 367-68 (6th Cir. 2015); *see also Robinson*, 503 F.3d at 532 (finding that because the defendant sought to obtain discovery to support "various sentencing arguments," rather than to aid in the preparation of his defense, his request was not

material, and, thus, fell outside of the scope of Rule 16(a)(1)(E)(i)). Gibbs entered a guilty plea on the drug conspiracy charge without a written plea agreement. (R. 60.) At sentencing, Gibbs challenged potential enhancements under the Guidelines, and raised the issue of discovery related to fourteen defendants indicted in separate cases. On appeal, Gibbs maintains that the materials could have demonstrated that the confidential informant, not he, was a leader or organizer of the conspiracy, and could bear upon the reliability of the informant. (*Id.* at 26.) Accordingly, because Gibbs failed to establish materiality, the district court did not abuse its discretion.

Gibbs also argues that the requested discovery constituted *Brady* material to which he was entitled. Gibbs did not raise the issue of a possible *Brady* violation in the district court. Because Gibbs raises this issue for the first time on appeal, we review the question of a possible *Brady* violation "at most for plain error." *United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004) (citing *United States v. Delgado*, 350 F.3d 520, 527 n.10 (6th Cir. 2003)). In *Brady v. Maryland,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). This rule applies to exculpatory evidence, as well as to impeachment evidence. *Crayton*, 357 F.3d at 569 (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

We conclude that Gibbs has failed to carry his burden of establishing that the discovery sought was material to the case. Agent Muse testified that some of the fourteen individuals implicated in the Maysville drug trafficking investigation, but indicted in other cases, were familiar with Gibbs, and had been surveilled at his house "on many occasions." (R.145, ID 631.) However, Agent Muse also indicated that the fourteen defendants engaged in controlled buys

with the confidential informant, but they were unrelated to Gibbs. (*Id.* at 632, 637.) Based on these facts, Gibbs speculates that materials relating to the other defendants could support his arguments with respect to the leader/organizer sentencing enhancement and "could have contained conflicting and impeaching statements" made by the confidential informant, Kirk and Slater. (Appellant Br. at 27.). Gibbs's speculation is insufficient to establish that the discovery sought was material to the case. Accordingly, we conclude that the district court did not plainly err in denying Gibbs's request for discovery.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the sentence imposed by the district court.