RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0230p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 16-6667

JOHNNY D. PHILLIPS,

*Defendant-Appellant.*

─────────────

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 2:14-cr-00076-11—J. Ronnie Greer, District Judge.

Argued: October 5, 2017

Decided and Filed: October 10, 2017

Before: SUTTON, DONALD, and THAPAR, Circuit Judges.

─────────────

#### COUNSEL

─────────────

**ARGUED:** J. Alex Little, BONE MCALLESTER NORTON PLLC, Nashville, Tennessee, for Appellant. Debra A. Breneman, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** J. Alex Little, BONE MCALLESTER NORTON PLLC, Nashville, Tennessee, for Appellant. Debra A. Breneman, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

─────────────

#### OPINION

─────────────

SUTTON, Circuit Judge. Johnny Phillips makes his living as a "land man." Land men scout rural property for coal mining potential and negotiate leases with the landowners to mine it. When the government found out that Phillips performed work for New Century Coal, a company

that swindled millions of dollars from investors, it charged him with several crimes.  A jury convicted him of conspiracy to commit mail and wire fraud.  We affirm.

I.

Blue gem coal burns hotter and cleaner than traditional thermal coal, making it useful for producing silicon, a critical ingredient of computer chips and solar panels.  Federal and state environmental regulations make it difficult to mine, however, and demand for the coal outstrips its supply as a result.  Blue gem coal commands premium prices.

New Century Coal advertised itself as one of the largest blue gem coal companies in the country.  Not only did it purport to own land with valuable deposits of blue gem coal, it also claimed to have the much sought after permits to mine it.  The company had little trouble convincing individuals to invest in it.

As it turns out, New Century Coal did not possess a lot of the land and permits it claimed to have.  By the time law enforcement caught on, the company had swindled more than $14 million from more than 160 investors.

The government accused twelve people of being in on the scheme.  Most of them, including the mastermind, Brian Rose, pleaded guilty.  Only Johnny Phillips went to trial.  The government charged him with three crimes:  conspiring to commit mail and wire fraud, conspiring to launder money, and laundering money.

The government's case against Phillips consisted mainly of the testimony of several conspirators, some investors, and a government investigator.  Evidence showed that Phillips, in his role as a land man, helped Rose, a NASCAR driver with little experience in the coal industry, identify land with coal-mining potential.  He introduced Rose to a property dubbed "Thacklight," which New Century Coal eventually pitched to unwitting investors despite never owning the rights to mine it.  R. 584 at 118–22.  And he introduced Rose to the benefits of blue gem coal, which New Century Coal eventually claimed to mine.

The evidence portrayed Phillips as a coal-industry expert who helped New Century Coal convince investors that it was legitimate.  The testimony placed Phillips at a pitch meeting in

Missouri where Rose and two other New Century Coal representatives (Ray Spears and Bobby McGregor) used fake names. One investor at the meeting testified that he never would have invested in Thacklight without Phillips' presence at the meeting and the expertise he conveyed.

Phillips testified in his own defense, claiming to be more gullible than the investors. He had no idea, he said, that the company defrauded investors. He was not aware, he said, that the company never secured the rights to mine Thacklight, which he helped pitch to investors. And he found nothing suspicious, he said, about Rose, Spears, and McGregor's use of fake names.

The jury convicted Phillips of conspiracy to commit mail and wire fraud but acquitted him of the two money-laundering charges. The judge sentenced him to 30 months in prison.

II.

*Sufficiency of the evidence.* To convict Phillips on the conspiracy count, the government needed to prove that Phillips knowingly joined an agreement to commit mail and wire fraud and that a party to the agreement took an overt act in support of it. *United States v. Smith*, 749 F.3d 465, 477 (6th Cir. 2014). Phillips has nothing to say about some of these requirements. He does not challenge the proof showing he knowingly joined an agreement to commit fraud, and he does not challenge the proof showing that at least one person committed an overt act in furtherance of the conspiracy.

He focuses instead on the government's alleged failure to produce sufficient evidence that he "said something materially false" to investors. Appellant's Br. 36–37. According to Phillips, the government's theory at trial "was that Phillips was guilty of the charged crimes" because he "fail[ed] to disclose" that some members of New Century Coal used "fake" names when meeting with investors. *Id.* at 37. And because failing to disclose the use of fake names is not a "material misrepresentation," the government failed to prove its case. *Id.* at 39–40.

But this argument knocks on the wrong door. Whether Phillips made a "material misrepresentation" to investors is an element of the underlying *substantive* offense of fraud. *See Neder v. United States*, 527 U.S. 1, 25 (1999). The government need not prove the elements of fraud to convict Phillips of *conspiracy*. "It is elementary that a conspiracy may exist and be

punished whether or not the substantive crime ensues." *Salinas v. United States*, 522 U.S. 52, 65 (1997). And it is equally elementary that "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Id.* at 63. Even Phillips concedes that there was a conspiracy to defraud investors.

The only pertinent question, then, was whether Phillips was in on the scheme. The government did not need to show that Phillips made material misstatements to prove that.

That's the lesson of *United States v. Washington*, 715 F.3d 975 (6th Cir. 2013). A jury convicted the defendant of conspiracy to commit program fraud. She challenged the verdict on the ground that the government failed to prove that she "embezzled, stole or fraudulently obtained property," an element of the underlying substantive offense of program fraud. *Id.* at 979. In rejecting the argument, *Washington* explained that the government did not need to prove the elements of the fraud to convict the defendant of *conspiracy* to commit the fraud. *Id.* at 980. It was enough for the government to prove that the defendant knowingly and voluntarily joined an agreement to defraud and that a member of the conspiracy took an overt act in furtherance of it. *Id.* The same conclusion applies here.

For what it is worth, that is not Phillips' only problem. Even if the government were required to prove that Phillips made a material representation, there was sufficient evidence—beyond Phillips' failure to inform the investors of the fake names—that he did. Rose testified that Phillips falsely told investors that he purchased coal from New Century Coal. And there's evidence that Phillips falsely conveyed to investors that New Century Coal was ready to mine Thacklight, even though he knew that the company had not secured the leases and permits to do so. Viewing the evidence in the light most favorable to the government, a rational jury could have concluded that Phillips made material misstatements to investors. *See United States v. DeJohn*, 368 F.3d 533, 545 (6th Cir. 2004).

*Jury instructions.* Phillips chisels his second argument from the same flawed stone. Because the prosecution relied so heavily on the use of fake names, he contends, the district court should have instructed the jury that (1) "not all misrepresentations . . . are material," and (2) "a party does not have the right to accurate information before making an otherwise fair

exchange." Appellant's Br. 44–45. According to Phillips, his requested instruction would have admonished the jury that the use of fake names alone does not suffice to "establish the element of materiality." *Id.* at 45. As just shown, however, the government did not need to prove that Phillips made a material misstatement to convict him of conspiracy. The government indeed never made any such effort. The government used the fake names to prove that Phillips knew about the conspiracy and joined it, not to prove that Phillips made a material misstatement. In this context, Phillips' instruction would have done more to confuse than to inform. The court did not abuse its discretion in refusing to give it.

*Jury question.* Phillips complains that the district court should have answered one of the jury's questions differently. Here too we give district courts considerable discretion. *United States v. Fisher*, 648 F.3d 442, 446 (6th Cir. 2011). And here too no abuse occurred.

On the second day of deliberations, the jury asked: "Is it possible to convict the defendant of fraud without the parts of wire and mail being attached?" R. 620 at 2. The district court found this question confusing, and understandably so. The government did not charge Phillips with fraud; it charged him with conspiracy. The district court thought that the question could be interpreted in two ways. One possibility: the jury wondered if it could convict Phillips of *conspiracy* to commit mail and wire fraud without finding certain elements of mail and wire fraud (the answer, as just explained, is yes). The other: the jury wondered if it could convict Phillips of conspiracy without finding all the elements of conspiracy (the answer is no). Given this uncertainty, the district court worried that answering the question (either yes or no) would do more harm than good. It thus referred the jury back to the instructions already given.

That choice lay within its discretion. Although courts should "respond to questions concerning important legal issues," a "reference to or rereading of the instructions may suffice" if the issue "has been fully covered in the court's instructions." *United States v. Nunez*, 889 F.2d 1564, 1569 (6th Cir. 1989).

The court's instructions dealt with each possibility. Start with the first interpretation of the question: Could the jury convict Phillips of conspiracy to commit mail and wire fraud without finding certain elements of mail and wire fraud? The instructions answered that question

by explaining that the government need only prove the two elements of conspiracy. So too with the second: Could the jury convict Phillips of conspiracy if it failed to find all of the elements of conspiracy? The instructions answered that question by telling the jury "all the elements . . . must be proved beyond a reasonable doubt," and that Phillips is not guilty "if the government has failed to carry its burden of proof." R. 619 at 122–23.

Phillips resists this conclusion on the ground that the jury question conveyed no such uncertainty. The *only* reasonable interpretation of the question, he says, is the second one, and the judge was required to answer the inquiry with an unqualified no. We disagree. It seems just as likely (if not more likely) to us that the jury was confused about whether the government had to prove the elements of mail and wire fraud to convict Phillips of conspiracy. Even Phillips' counsel at trial did not think that the question was clear. When asked to give his opinion about the jury question, he stated: "Your Honor, I think the issue they've asked can you kind of separate parts of that off. What does that mean, I'm not exactly sure." R. 620 at 3. We aren't either. No reversible error occurred.

*Confrontation Clause.* Phillips maintains that the district court unfairly limited cross-examination of Rose when it prevented his counsel from asking follow-up questions about Rose's history of mental instability. Here is the exchange:

> [Rose]: It has created a situation when I was detoxing off of benzodiazepines and alcohol to hallucinate during a time period of about two to three weeks. I can't remember the year but yes, Sir. . . . When I quit cold turkey it created anxiety and I had a very high rate of seizures. It took me a while to detox off of them. Therefor[e] I went to an outpatient clinic three days a week to detox off of them and come clean.

> [Defense counsel]: Do you remember being asked in the Hearing whether you reported homicidal thoughts to the treatment provider in June of 2013?

> [Prosecutor]: I'm going to object, Your Honor, I don't know where this is going and how . . .

> [Defense counsel]: This is going to his mental state and his ability to remember, Your Honor.

> [Prosecutor]: I don't know how that shows memory.

> [The court]: I don't see how that goes to memory. . . . Sustained. . . .

[Defense counsel]:  Were you suicidal, Mr. Rose?

[Prosecutor]:  Objection, I don't know how this goes to memory.

[Defense counsel]:  In June of 2013 were you suicidal?

[The court]:  Just a minute, . . . you've got to wait on me to rule on the objection. Why are you offering this?

[Defense counsel]:  To prove, Your Honor, that this man was mentally unstable and it might reflect upon his ability to recall truthful information.

[The court]:  It might?

[Defense counsel]:  Yes, I think the Jury is entitled to know that.

[The court]:  Sustained.

R. 638 at 709–11.

Phillips argues that these restrictions violated his rights under the Confrontation Clause, which "guarantees an opportunity for effective cross-examination," including the opportunity to probe a witness about potential biases. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). He argues in particular that the court prevented his counsel from asking about the dates of Rose's mental instability, which would have cast doubt about Rose's ability to recall his interactions with Phillips. Best we can tell, however, the district court did no such thing. It merely limited questions about Rose's homicidal and suicidal thoughts. The defense counsel was still free to ask whether Rose experienced hallucinations in June 2013. The defense counsel likewise was free to ask Rose about the extent of those hallucinations. But the defense counsel never asked those questions. Phillips had the "opportunity for effective cross-examination." He just didn't take advantage of it, preferring instead to try to bring up Rose's suicidal thoughts.

Phillips persists that the court's evidentiary rulings crossed the line because he has "a constitutional right to inform the jury of *all* matters affecting Rose's credibility." Reply Br. 18. Not exactly. The Confrontation Clause does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Van Arsdall*, 475 U.S. at 679 (quotation omitted). District courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . interrogation that is repetitive or only marginally relevant." *Id.* The court did not abuse its discretion in concluding that Rose's suicidal thoughts

had little (if anything) to do with his memory.  It thus limited these questions, quite fairly in our view.

*Lay opinion testimony.*  Phillips adds that the court abused its discretion by permitting a lay witness to offer opinion testimony on guilt.  But any potential error, if error there was, was harmless.

At trial, Nick Worsham, an IRS agent who reviewed the financial records of New Century Coal and Phillips, testified that, based on his review of the records, there was a "correlation between key events of the New Century Coal activities and . . . the payments to Mr. Phillips."  R. 584 at 34.  Phillips received five separate checks within a few months of the Thacklight investment pitch in Missouri and seven more around the time of a second meeting.  Based on his investigation, Worsham concluded that Phillips "received $58,750 [in] criminally derived proceeds from . . . New Century Coal."  *Id.* at 30.

> Worsham's testimony culminated in the following exchange:
>
> [Prosecutor]:  Based upon your training and experience and your knowledge of the facts in this case, did two or more persons agree to accomplish a common plan to launder money in New Century Coal?
>
> [Worsham]:  Yes, ma'am, they did.  There was actually several individuals, including Johnny Phillips, Brian Rose, Thomas Berry, William Heath Morris, Brent Loveall, Robert McGregor.  All these individuals essentially agreed to the plan in which they presented to investors using fake names, they made fake representations to these investors, and they essentially sold a coal mine that they had no lease to –
>
> [Defense counsel]:  Your honor, I object to the entire answer.  That's a conclusion that goes to the ultimate issue.
>
> [The court]:  All right.  Ladies and gentlemen, most of these issues are ultimately going to be for you to decide.  I will tell you when I instruct you that Agent Worsham is what's called an opinion witness.  You don't have to accept his opinion.  There's several things you should look at in deciding whether his opinion is something you should accept or not, including whether it's based on the facts as you find them; but, otherwise, he may testify on the, on that question.

*Id.* at 39–40.

Phillips says that the court should not have allowed Worsham to offer his opinion that Phillips was part of a criminal conspiracy and received criminally derived proceeds from it. "An opinion is not objectionable just because it embraces an ultimate issue," says Rule 704 of the Federal Rules of Evidence. When assessing whether a district court may admit an opinion from a lay witness, we look to Rule 701, which permits opinion testimony if the opinion is (1) "rationally based on the witness's perception" and (2) "helpful to clearly understanding the witness's testimony or to determining a fact in issue."

Although Rule 701 calls these criteria distinct factors, they are interrelated. The basis of a witness's opinion will often determine the helpfulness of the testimony. *United States v. Pinke*, No. 09-01-01, 2009 WL 4432669, at *3 (E.D. Ky. Dec. 2, 2009). If a handful of discrete facts form the basis of the opinion, the witness usually will be most helpful by stating those facts and allowing the jury to form its own opinion. *See United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992); *United States v. Hampton*, 718 F.3d 978, 981 (D.C. Cir. 2013). This is especially true when a witness leaps from specific facts to an opinion on the ultimate issue. That's why we have explained that it "seldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since the jury's opinion is as good as the witness's." *Mitroff v. Xomox Corp.*, 797 F.2d 271, 276–77 (6th Cir. 1986).

In this instance, the court at a minimum toed the abuse-of-discretion line when it allowed Worsham to testify that Phillips was part of a conspiracy and received "criminally derived proceeds." Worsham based his opinion on an analysis of financial records and the temporal correlation between the company's fraudulent activities and the checks it issued Phillips. But after he told the jury about the correlation, the jury was in just as good a position as Worsham was to assess its significance. *See United States v. Harris*, 786 F.3d 443, 448 (6th Cir. 2015). It's hard to understand how the government added value by introducing Worsham's opinions.

We need not decide whether the district court abused its discretion, however. Any potential error was harmless. The key thrust of the prosecutor's question was whether Phillips conspired to *launder money*. And Phillips was acquitted of *that* charge.

True, Worsham's response to the prosecutor's question might have touched on whether Phillips was part of a conspiracy to commit fraud. But we think the district court's follow-up instruction cured any error. After defense counsel objected to Worsham's testimony, the court told the jury that "most of these issues are ultimately going to be for you to decide." R. 584 at 40. It instructed the jury that it should decide for itself, "based on the facts as [it] find[s] them," whether or not to come to the same conclusions as Worsham. *Id.* Given the court's instructions, we can say "with fair assurance" that the jury didn't blindly rely on Worsham's testimony instead of looking at the evidence with its own eyes. The error did not substantially affect the jury's verdict. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

For these reasons, we affirm.