## NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 19a0247n.06

Case No. 18-1652

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>May 08, 2019<br>DEBORAH S. HUNT, Clerk |
|  | ) |  |
| Plaintiff-Appellee, | ) |  |
|  | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
|  | ) | THE EASTERN DISTRICT OF |
| ARTHUR RATHBURN, | ) | MICHIGAN |
|  | ) |  |
| Defendant-Appellant. | ) |  |

BEFORE: SILER, GIBBONS and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** After a jury trial, Arthur Rathburn was convicted of seven counts of wire fraud, in violation of 18 U.S.C. § 1343 and one count of illegal transportation of hazardous material, in violation of 49 U.S.C. § 46312.[1] Specifically, the government charged Rathburn with renting out human bodies and body parts that tested positive for HIV and hepatitis B to unsuspecting medical professionals. Rathburn was also charged with transporting a diseased human head overseas and back to the United States without proper packaging or labeling, in violation of federal law. The district court sentenced Rathburn to 108 months' imprisonment. Rathburn appeals his convictions, raising several challenges,

---

[1]Rathburn was also indicted on two additional counts of wire fraud and two counts of making false statements in violation of 18 U.S.C. § 1001(a)(2). The jury acquitted Rathburn of these charges.

including insufficient evidence, violation of his right to confrontation, improper jury instructions, and improper evidentiary rulings. We affirm.

## I.

## BACKGROUND

Rathburn owned and operated International Biological, Inc. ("IBI"), a Michigan corporation, until 2013 when it was raided by the FBI and Rathburn and his then wife, Elizabeth Rathburn, were indicted on charges of wire fraud. IBI supplied human cadavers and other anatomical specimens to medical professionals for training purposes. Elizabeth Rathburn[2] managed IBI and primarily interacted with its customers. Rathburn obtained donated cadavers and body parts ("specimens") from two Chicago-based companies, Anatomical Services, Inc ("ASI") and Biological Resource Center of Illinois ("BRCIL"), who obtained their specimens from the Arizona-based Biological Resource Center ("BRC").[3]

Each specimen came accompanied by a donor information sheet and a serology report, which indicated whether the specimen tested positive for certain infectious diseases, such as HIV and hepatitis B and C viruses. Once IBI received the specimen and report, Rathburn would store the specimen in IBI's warehouse to rent to medical professionals for medical or dental training courses.

Particularly important here, Rathburn drafted, and directed employees to provide IBI customers, a Material Request Form ("MRF") and Service Agreement (collectively, "contracts"). The MRF read, in pertinent part: "All anatomical materials are . . . tested for HIV and hepatitis A,

---

[2]Elizabeth Rathburn divorced Rathburn prior to trial.

[3]After discovering that ASI and BRC obtained their supply of infectious specimens from BRCIL, Rathburn sought to cut out the middle-man and do business with BRC directly, but BRC refused. BRC's business was shut down and Stephen Gore, a principal in BRC, was charged in Arizona state court of violating the wishes of donors and supplying infected remains.

B and C." The MRF provided for further testing "upon request at an additional charge." The Service Agreement stated, in part:

> Unless expressly set forth on MRF, the anatomical materials to be provided hereunder *will have been screened for HIV ½, Surface Antigen, Hepatitis B and Hepatitis C Virus Antibody* and shall accordingly be treated by service user and its research participants as if such materials may be infectious. Service provider expressly disclaims any liability should any anatomical material prove infectious.

(emphasis added).

Rathburn provided identical contracts containing this provision to all IBI customers. Elizabeth Rathburn testified that the "goal" of this language was to "assure the customer that they were getting a clean body to work on." Despite these explicit assurances, Rathburn obtained specimens that tested positive for infectious diseases for discounted prices and supplied them to IBI customers, while concealing the positive test results. According to Elizabeth Rathburn, Rathburn did not disclose positive results "[b]ecause the customer wouldn't have accepted the specimen and IBI would have lost the contract." Instead, she testified that Rathburn believed that by embalming the specimens, it would "yield the virus inactive."

Dr. Samuel Lee, a periodontist, testified that IBI supplied a human head for a March 2011 dental-implant training course that he led for Harvard University. Unbeknownst to Dr. Lee, the head that IBI provided tested positive for hepatitis B. Dr. Lee testified that he believed the language in the contracts—that the specimen would be "screened" and "tested" for hepatis B— meant that IBI would not intentionally provide him with a "specimen that [was] infected with [hepatitis B]." Though Dr. Lee testified that he used "universal precautions" despite Rathburn's assurances, he nonetheless would have "prefer[red] not to use a cadaver that tested positive for hepatitis B" and would have declined IBI's services had Rathburn disclosed the positive results.

Similarly, Dr. Kevin Vorenkamp, an anesthesiologist and director of the American Society of Anesthesiologist's ("ASA") pain workshop, obtained a cadaver from IBI for use in a training

conference in October 2012. The serology report obtained by Rathburn revealed that the specimen tested positive for HIV and hepatitis B.[4] Rathburn supplied the infectious specimen to Dr. Vorenkamp as well without disclosing the positive test results. Rathburn also provided Dr. Vorenkamp with a cadaveric demographic sheet that falsely indicated the specimen "tested negative for HIV, hepatitis."

Like Dr. Lee, Dr. Vorenkamp understood the language in the contracts to mean that IBI would screen and test the specimens for HIV and hepatitis B, and that the ASA "would not get a body that tested positive." Although he, too, used universal precautions, Dr. Vorenkamp testified that he would not have knowingly received a specimen that tested positive for HIV and hepatitis B "out of concern for cutting into [infected] bodies."

The MRF also provided that all specimens would be procured under "clean, not sterile conditions." According to FBI Special Agent Leslie Larsen, Rathburn's facility was all but clean. Agent Larsen testified that upon entering Rathburn's warehouse, she observed, among other things: "upwards of 10 to 20" piles of dead flies and other insects; "dirt and dust . . . caked" on the floor; multiple specimens "frozen together . . . flesh-to-flesh," with no barriers to prevent cross contamination, and dried blood splattered across the floor.

Elizabeth Rathburn confirmed that the conditions observed by Agent Larsen were consistent with the daily conditions of IBI's warehouse during the times the IBI provided specimens to Doctors Lee and Vorenkamp in 2011 and 2012.[5] Both doctors testified that they

---

[4]Due to the infected status of the specimen, Rathburn received a credit in the amount of $3,500.

[5]Elizabeth Rathburn further testified that Rathburn often stored specimens in such a manner that they froze together and Rathburn would need to use a crowbar to separate.

would not have paid IBI for the specimens had they known Rathburn procured them under unsanitary conditions.

The government also charged Rathburn with illegally transporting hazardous material, stemming from his shipment of eight human heads from Tel Aviv to Detroit, Michigan, one of which came from a donor whose cause of death was "bacterial sepsis and bacterial pneumonia." Although Stephen Gore with BRC testified that Rathburn was provided a burial transit form revealing the donor's cause of death as bacterial sepsis, Rathburn shipped the infected specimen to Tel Aviv for an overseas training course, and back to Detroit, Michigan in only a trash bag placed inside a camping cooler.

Prior to trial, Rathburn attempted to introduce evidence that, although the specimens tested positive for infectious diseases at the time of death, they were not actually infectious at the time of the courses.[6] The government sought to exclude this evidence, arguing that the case was about whether Rathburn intentionally misled IBI customers into believing he would not intentionally provide them with specimens that tested positive for infectious diseases, not whether the specimens were actually infectious at the time of the course. The district court reserved its ruling for trial, at which time it agreed with the government and excluded evidence relating to whether the specimens were infected at the time of the courses. The district court reasoned:

> We're not talking about transporting diseases to the world. We're talking about the charge in the indictment where the fraud is that they made a contract, they violated that by sending diseased parts, and that's the story. Whether someone at a conference could have caught the disease, we're not going to go into that.

---

[6]In his motion for acquittal, Rathburn presented an email from Dr. Carl Schmidt opining that it was "unlikely" that the specimens were infectious at the time of the courses because: "(1) the lab reports were negative; (2) anatomical preservation liquids, such as formalin and the embalming fluids are toxic and tend to inactivate almost all infectious agents; and (3) the time lapse since death would have inactivated about anything that had serious infective potential."

At the close of his case, Rathburn moved for judgment of acquittal on all counts, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, which the district court denied.

Rathburn timely appeals and raises the following challenges: (1) the government presented insufficient evidence to support his convictions; (2) 49 U.S.C. § 46312 is unconstitutionally vague because it fails to give fair notice of what constitutes an infectious substance; (3) the district court denied him his right of confrontation; (4) the district court allowed inadmissible evidence by permitting witnesses to testify about what they believed the contracts meant, in violation of Michigan law; (5) the district court's failure to give jury instructions regarding alternate interpretations of the service agreement under Michigan law violated his due process rights; and (6) the graphic photos shown to the jury were unfairly prejudicial.

## II.

### ANALYSIS

#### 1. Sufficiency of the Evidence for Wire Fraud

Rathburn first argues that there was insufficient evidence to support his convictions of wire fraud. To succeed in challenging the sufficiency of the evidence, Rathburn must demonstrate that, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Clark*, 928 F.2d 733, 736 (6th Cir. 1991) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "A defendant bringing such a challenge bears a 'very heavy burden.'" *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986)).

Wire fraud requires the government to prove three elements: "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to

deprive a victim of money or property." *Id.* at 485 (citation and internal quotations omitted). Rathburn contends the government failed to establish the first and third elements.

With regard to the first element, Rathburn avers the government failed to establish that he made a material misrepresentation because the contract only "provided for screening" of HIV and hepatitis B and C, which Rathburn contends was satisfied. According to Rathburn, agreeing to screen specimens is "[f]ar from a contractual promise of a disease-free specimen." Thus, he contends there was insufficient evidence to sustain his conviction. We disagree.

We have recognized that a scheme to defraud requires "sufficient evidence of several misrepresentations," and "includes any plan or course of action by which someone intends to . . . deprive another by deception of money or property by means of false or fraudulent pretenses, representations, or promises." *Daniel*, 329 F.3d at 485 (quoting *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 479 (6th Cir. 1999)). A scheme to defraud is not measured by a "technical standard," but rather is a "reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979) (citation and internal quotation marks omitted).

Applying this standard, the government presented sufficient evidence that Rathburn intended to defraud IBI customers into believing he would not supply them with specimens that tested positive for infectious diseases. First, the ordinary understanding of a promise to "test" and "screen" for HIV and hepatitis creates a reasonable understanding that IBI would not supply specimens in spite of a positive result. In addition to its common-sense understanding, Elizabeth Rathburn testified that Rathburn purposefully provided this language in the contracts to "assure the customer that they were getting a clean body." Rathburn's intent to deceive is further evidenced by the donor information sheet that he provided to Dr. Vorenkamp, explicitly indicating

that the specimen "tested negative for HIV, hepatitis," when Rathburn knew that was false. This was sufficient evidence for a rational trier of fact to find that Rathburn acted with the intent to defraud customers.

Rathburn's misrepresentations were indeed material. A statement is materially false "if it has a natural tendency to influence, or [is] capable of influencing, the [decision-maker]." *Neder v. United States*, 527 U.S. 1, 16 (1999). Doctors Lee and Korenkamp testified that they believed that by promising to "screen" and "test" the specimen, Rathburn would not intentionally provide them with infectious specimens and that they would have rejected the specimens had they known of the positive results. Moreover, Elizabeth Rathburn's testimony that Rathburn did not disclose positive results "[b]ecause the customer wouldn't have accepted the specimen and IBI would have lost the contract" further signals Rathburn's knowledge of the materiality of the contract language.

Relying on the following language in the Service Agreement: "[IBI] disclaims any liability should any anatomical material prove infectious," Rathburn contends this language demonstrates that "there were no guarantees that the specimen would not be infected." This argument falls flat. That the contracts did not provide a "guarantee" that the specimens would *never* be infected does little to counter Rathburn's indication that diseased specimens would be screened out and not intentionally provided to customers.

The third element of wire fraud requires that "the misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission." *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998). Rathburn contends there was insufficient evidence to establish that he intended to deprive IBI customers of money because his failure to disclose the screening results "was of no real consequence." As support, Rathburn relies on the following: (1) the

agreement explicitly warned customers that the "specimens could be infected," and to use "universal precautions;" and (2) the "the course[s] [were] a success," therefore the customers "suffered no financial harm." This is all beside the point.

Indeed, the Service Agreement provided cautionary language expressly limiting liability in the event a specimen proved infectious. However, providing a specimen that "could" theoretically prove infectious despite being screened is a far cry from providing specimens that are "known" to have tested positive for infectious diseases. Rathburn appears to suggest that, because the doctors used universal precautions, they did not rely on the misrepresentations made in the contracts. What Rathburn overlooks is that "reliance is not one of the two elements of wire fraud." *United States v. Griffith*, 17 F.3d 865, 875 (6th Cir. 1994) (citation omitted). Thus, that IBI customers used universal precautions despite Rathburn's assurance that the specimens would be screened for certain infectious diseases is not relevant.

Moreover, whether the course was ultimately successful is likewise immaterial to a wire fraud analysis. *See United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir. 1994) ("[T]he mail and wire fraud statutes do not require proof that the intended victim was actually defrauded; the actual success of a scheme to defraud is not an element." (citation omitted)). What is relevant, however, is whether Rathburn made misrepresentations intending to get IBI customers to pay money for specimens that they otherwise would not have. *See Daniel*, 329 F.3d at 487 ("It is sufficient that the defendant by material misrepresentations intends the victim to accept a substantial risk that otherwise would not have been taken.").

The record demonstrates sufficiently that the doctors would not have paid Rathburn for the specimens but for his representations that they would be screened for infectious diseases. Elizabeth Rathburn testified that if IBI customers knew of the positive results, they "wouldn't have

accepted the specimen." Doctors Lee and Vorenkamp both confirmed that they depended on the language in the contracts as assurance that the specimens had been screened that they would not have paid IBI for the specimen had Rathburn disclosed the positive results. This was sufficient for a jury to determine that Rathburn intended to deprive IBI customers of money. Rathburn fails to meet his "heavy burden" of showing that "[no] rational trier of fact could have found the essential elements of" wire fraud.[7] *Id.* at 485; *Clark*, 928 F.2d at 736.

### 2. Sufficiency of the Evidence for Illegal Transportation of Hazardous Material & Vagueness

Rathburn raises two challenges with respect to his conviction for illegally transporting hazardous material, in violation of 49 U.S.C. § 46312: (1) the statute is unconstitutionally vague, and (2) there was insufficient evidence to sustain his conviction. We address both below.[8]

*Vagueness*. We review de novo whether a criminal statute is unconstitutionally vague. *United States v. Namey*, 364 F.3d 843, 844 (6th Cir. 2004) (citation omitted). To demonstrate that § 46312 is unconstitutionally vague, Rathburn must show that it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or

---

[7]Rathburn also contends that, because the FBI raid occurred in 2013, a year after the relevant courses were conducted, there was insufficient evidence to establish that the warehouse was not clean during the relevant time periods. This claim likewise fails. Elizabeth Rathburn testified that the condition of the warehouse, as depicted in the photographs taken by the FBI, were consistent with its daily conditions in 2011 and 2012. This, too, was sufficient for a jury to find intent to defraud.

[8]Relying on Fed. R. Crim. P. 12(b)(3)(A), the government contends Rathburn waived his vagueness argument because he failed to raise it pretrial. However:

> Fed. R. Crim. P. 12(b)(2) provides that "Lack of jurisdiction or the failure of the indictment or information to charge an offense shall be noticed by the court at any time during the pendency of the proceeding." The defense of failure of an indictment to charge an offense includes the claim that the statute apparently creating the offense is unconstitutional.

*United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973). Thus, this objection may be raised at any time. *Id.*

encourages seriously discriminatory enforcement." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation and internal quotation marks omitted).

Rathburn contends he was not provided fair notice of what conduct the statute prhibted because the statute's "clear purpose" of preventing the transportation of "infectious" substances is contradicted by the Department of Transportation's ("DOT") definitional expansion to include material "known or reasonably expected" to be an infectious substance. Rathburn's claim, while couched as a vagueness argument, more accurately challenges the DOT's authority to define infectious substances under the statute. Where Congress empowers an agency to promulgate rules and regulations necessary to carry out an Act, we must uphold those regulations "so long as it is reasonably related to the purposes of the enabling legislation." *Jackson v. Richards Med. Co.*, 961 F.2d 575, 581 (6th Cir. 1992) (citation and internal quotation marks omitted).

The relevant statute, § 46312(a)(1), makes it a federal offense to "deliver[]" or "cause[] to be delivered" hazardous materials to an air carrier for shipment. By explicit delegation, Congress authorized the DOT to designate as hazardous any material that "may pose an unreasonable risk to health and safety or property." 49 U.S.C.A. § § 5102, 5103. In line with this directive, the DOT defines an infectious substance as "a material known or reasonably expected to contain a pathogen." 49 C.F.R. § 173.134. The DOT defines a pathogen as "a microorganism . . . including bacteria [or] viruses . . . that can cause disease in humans or animals." § 173.134(a)(1). It is indisputable that the question of what an infectious substance is "has been duly delegated to the [DOT], with its expertise, to [answer]." *Chrysler Corp. v. Dep't of Transp.*, 472 F.2d 659, 675 (6th Cir. 1972). Rathburn fails to demonstrate how the DOT's definition of infectious substance runs contrary to § 46312(a)(1)'s purpose. That Rathburn would prefer that substances "reasonably

expected" to contain an infectious substance not come within the purview of the statute is insufficient to challenge its constitutionality. This argument fails.

*Sufficiency of the evidence.* Rathburn's sufficiency of the evidence challenge fairs no better. At trial, the government charged Rathburn with transporting via air carrier a human head that was obtained from a body whose cause of death was "bacterial sepsis and bacterial pneumonia"—both Category B Biological Substances under § 46312. *See* C.F.R. § 173.134. Category B infectious substances are defined as substances not generally capable of causing "life-threatening or fatal disease in otherwise healthy humans or animals when exposure to it occurs." *Id.* As relevant here, prior to shipping a Category B infectious substance, it "must be packaged in a triple packaging consisting of a primary receptable, a secondary packaging, and a rigid outer packaging." C.F.R. § 173.199(a)(1)–(3). The primary receptacles must be packed "in such a way that, under normal conditions of transport, they cannot break, be punctured, or leak their contents into the secondary packaging." § 173.199(a)(2). Finally, the wording "Biological substances, Category B" must be marked on the outer packaging, with UN337 in contrasting color. § 173.199(a)(5). Knowledge of the regulations is "not an element of an offense . . . but shall be considered in mitigation." 49 U.S.C. § 46312.

Rathburn does not dispute that the specimen he shipped overseas and back to the United States was not packaged in accordance with the DOT regulations. Nor does he dispute that the package failed to include the required Category B labeling.[9] Instead, Rathburn contends that the

---

[9]Though Rathburn argues that the infectious status has been neutralized at the time of shipment, Mark Razny with DOT testified that a specimen maintains its designation as a Category B substance until it is either cremated or autoclaved, neither of which Rathburn did prior to shipment. In any event, whether the specimen was infectious at the time of shipment is inconsequential to the relevant question under the DOT regulations of whether it was "known or reasonably expected" to be an infectious substance. 49 C.F.R. § 173.134.

donor summary provided by BRC indicated the cause of death as "Parkinson's disease" and "pelvic fracture." But the government provided contrasting testimony from Stephen Gore, who testified that the burial transit form that accompanied the specimen when it was sent from BRC, indicated the donor's cause of death as "bacterial sepsis and bacterial pneumonia." Viewing this conflicting evidence in favor of the government, a reasonable trier of fact could conclude that Rathburn was aware of the donor's cause of death when he shipped the specimen without proper packaging or labeling. *See United States v. Tilton*, 714 F.2d 642, 645 (6th Cir. 1983) ("[A]n appellate court must view all the evidence in the light most favorable to the government, resolve all inferences which may reasonably be drawn from the evidence in the government's favor and resolve all conflicts in the testimony in the same way.") (citation omitted). Therefore, Rathburn's sufficiency of the evidence challenge fails,

### 3. Confrontation Clause

Next, Rathburn asserts the district court denied him his right to confrontation by allowing the government to introduce evidence to suggest that the specimens were likely infected, but failed to permit him to cross-examine and present evidence to demonstrate that the specimens were not actually infected. We review de novo "[e]videntiary rulings relating to violations of the Confrontation Clause." *United States v. Henderson*, 626 F. 3d 326, 333 (6th Cir. 2010) (citation omitted). The Confrontation Clause guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). The Confrontation Clause does not prohibit a trial judge from imposing reasonable limits on cross-examination based on concerns about confusion of the issues. *See id.*

Rathburn asserts that the district court denied him his right of confrontation by permitting the government to elicit testimony "that [IBI customers] would have rejected the human remains . . . because they feared infection," but refused to allow Rathburn to elicit cross-examination or

present evidence to show the specimens were not infectious at the time of the courses. We disagree with Rathburn. The district court proscribed Rathburn from presenting evidence or cross-examining witnesses about whether the specimens were infectious at the time of the courses, reasoning that their infectiousness during the courses was irrelevant to whether Rathburn intentionally defrauded customers and would unnecessarily confuse the jury.

We find the district court's limitation reasonable for two reasons. First, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 59 (2004). None of the government's witnesses testified that the specimens were infectious at that time of the courses. Although the doctors called by the government did testify that they would have rejected specimens that tested positive for an infectious disease out of general fear related to the spread of infection, this demonstrated the reason the doctors prefer disease-free specimens. But why the doctors would have rejected specimens known to have tested positive for infectious diseases goes to the *materiality* of Rathburn's misrepresentations—not to the *truth* of whether the specimens were actually infectious at the time of the courses. Thus, Rathburn's inability to cross-examine witnesses about whether the specimens were infectious during the courses did not violate his right to confrontation.

Second, as an element of wire fraud, the government charged that Rathburn intentionally deprived IBI customers of money by misleading them into believing he would not knowingly supply them specimens that tested positive for infectious diseases. Whether the specimens were infectious at the time of the courses is insignificant to the relevant inquiry of whether Rathburn obtained money by falsely representing that he would screen against certain infections. *See United States v. Phillips*, 872 F.3d 803, 809 (6th Cir. 2017) ("District courts retain wide latitude insofar

as the Confrontation Clause is concerned to impose reasonable limits on . . . interrogation that is repetitive or only marginally relevant.") (internal quotation marks omitted) (quoting *Van Arsdall*, 475 U.S. at 679). Importantly, Rathburn was permitted to present evidence and cross-examine witnesses with respect to whether the specimens tested positive for the infectious diseases and whether he was aware that they did. This was sufficient for him to defend against the elements of wire fraud. *See id.* ("[The Confrontation Clause does not guarantee cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."). The district court did not err in limiting evidence and cross-examination related to whether the specimens were infectious during the courses.

Next, Rathburn raises two separate, but related, challenges: (1) the district court admitted inadmissible evidence by permitting witnesses to vary and add to the express terms of the contract, in violation of Michigan state law; and (2) the district court improperly refused to give jury instructions regarding contract interpretation under Michigan law.

*Inadmissible Evidence.* We afford the district court "broad discretion on evidentiary rulings because this type of decision turns upon the evidence as developed during the course of a trial." *United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990) (citation omitted). Rathburn contends that, because the plain language of the Service Agreement provided only that the specimens would be "screened" for certain infectious diseases, the district court was obligated to invoke Michigan contract law to bar witness testimony regarding what they "*believed the terms*" meant. Relying on Michigan law, Rathburn argues that the Service Agreement must be "enforced as written," and that "extrinsic evidence cannot be used to very (sic), add or contradict the express terms of the contract." Appellant's Br. at 37 (citing *Henderson v. State Farm Fire and Gas Co.*, 460 Mich. 348, 354 (1999) and *In Re Egbert R. Smith Trust*, 480 Mich. 19, 24 (2008)).

Rathburn is mistaken. The government charged Rathburn with wire fraud—not breach of contract. The elements of wire fraud are separate and district from Michigan contract law. *See United States v. Perry*, 537 F. App'x 347, 349 (5th Cir. 2013) (recognizing that common law contract rules are inapplicable to the crime of wire fraud); *see also Daniel*, 329 F.3d at 486 (observing that "common law requirements of justifiable reliance and damages . . . have no place in the federal fraud statutes"). Rathburn points to no authority to support his contention that Michigan contract law should apply in this context.

*Jury Instruction.* Rathburn's contention that the district court improperly refused to give jury instructions regarding contract interpretation under Michigan law fails for the same reasons above—Michigan contract law is irrelevant to the federal charge of wire fraud. As the district court also noted, "[w]hile [Rathburn's] preference would have been a civil suit charging breach of contract" this was not the case before the jury.

### 4. Inadmissible Photographs

Lastly, Rathburn takes issue with several photographs presented to the jury of specimens recovered by the FBI during its raid of Rathburn's warehouse in December 2013 as well as photographs depicting the unsanitary conditions of the warehouse. "Evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *United States v. Boyd*, 640 F.3d 657, 667 (6th Cir. 2011) (citing Fed. R. Evid. 403). Moreover, "the admission of relevant, potentially prejudicial evidence is placed within the sound discretion of the trial court." *United States v. Brady*, 595 F.2d 359, 361 (6th Cir. 1979).

Rathburn claims that the government's "deliberate" and "repeated" use of inflammatory photographs was "demonstrably prejudicial" and "therefore a new trial is mandated." The first set of photographs that Rathburn challenges depict: an open cooler with several human heads frozen together; frozen blood at the bottom of a freezer unit and floor; a human head and torso in a semi-

frozen state; dried blood in the bottom of a cooler; and a pile of dead flies on the floor. The remaining photographs depict: a human head, a cooler lined with blood, packaging that dripped with blood-like fluid, and the outer shipment packaging. The photographs were relevant to the government's charges of wire fraud, illegal transportation of hazardous material, and making materially false statements; any prejudice to Rathburn was neither unfair, nor did it substantially outweigh the probative value of the evidence.

With respect to the first set, as Rathburn acknowledges, in addition to charging that Rathburn materially misled customers to believe he would not provide specimens that tested positive for certain infectious diseases, the government charged Rathburn with intending to defraud IBI customers into believing that the specimens were procured under "clean" conditions. The government presented these photographs to demonstrate that Rathburn stored specimens flesh-to-flesh, without any protective, sanitary barriers to prevent cross-contamination, and that his representation that specimens were procured under "clean" conditions was fraudulent. Though potentially unpleasant, Rathburn does not demonstrate that the probative value of these photographs was substantially outweighed by unfair prejudice. *United States v. Hardy*, 228 F.3d 745, 750 (6th Cir. 2000). Indeed, we have recognized that probative "[e]vidence is not unfairly prejudicial simply because it is gruesome or disturbing." *Boyd*, 640 F.3d at 667–68; *see also United States v. Mellies*, 329 F. App'x. 592, 600 (6th Cir. 2009) (observing that, although photos of child pornography, "by its very nature, [are] inherently disturbing," they were not unfairly prejudicial because they were "essential to proving an element of the charged crime" (emphasis removed)).

The next group of photographs that Rathburn challenges relate to his charges of illegal transportation and making false statements. The government introduced photographs of the bloody

packaging that Rathburn used to ship the specimen into the United States as evidence that Rathburn failed to package the specimen according to the DOT regulations because liquid dripped throughout the internal packaging. The photographs of the external packaging revealed neither blood nor human specimens and were merely relevant to the government's charge that Rathburn failed to properly label the shipment as a Category B substance as required by DOT regulations.[10] Again, Rathburn fails to establish that the probative value of these photographs was substantially outweighed unfair prejudice to him.

The remaining photographs that Rathburn challenges relate to two charges of making materially false statements to the FBI, of which he was acquitted. The government sought to disprove two statements made by Rathburn: that the human heads he shipped from overseas were embalmed, and that the fluid discovered in the bottom of the cooler and dripping from the packaging was "Listerine," and not blood. To disprove the first, the government introduced a photograph showing that the human head that Rathburn claimed to have embalmed prior to shipment was not in fact embalmed.[11] As to Rathburn's second statement, the government introduced a photograph of the shipping package dripping in liquid to disprove Rathburn's claim that the fluid was Listerine instead of blood. These photographs were relevant to each charge brought by the government. Rathburn was ultimately acquitted of making false statements. This cuts against Rathburn's claim: that he was acquitted of these charges tends to illustrate that the photographs introduced by the government to establish his guilt were not unfairly prejudicial. *See*

---

[10]Rathburn contends that the photographs "were so prejudicial that one juror [indicated] he was in need of counseling." Two reasons demonstrate why this does not amount to prejudice. First, this was limited to a single juror and that juror was made an alternate. Second, that the photographs were disturbing does not, alone, rise to the level of prejudice. *Boyd*, 640 F.3d at 667–68.

[11]The government introduced two photographs of the same human head to show that it decayed over time—evidence that it was not embalmed.

*United States v. Johnson*, 726 F. App'x 393, 401–02 (6th Cir. 2018) (holding that a defendant failed to demonstrate prejudice in large part because he was acquitted of the charges where the jury would have been most likely to be prejudiced). Rathburn's evidentiary challenge fails.

### III.
### CONCLUSION

For these reasons, we affirm Rathburn's convictions.