RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0138p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 11-2364

SHERRY WASHINGTON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cr-20202-3—Paul D. Borman, District Judge.

Argued: November 27, 2012

Decided and Filed: May 14, 2013

Before: NORRIS, GIBBONS, and DONALD, Circuit Judges.

---

## COUNSEL

**ARGUED:** Carole M. Stanyar, Plymouth, Michigan, for Appellant. J. Michael Buckley, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Carole M. Stanyar, Plymouth, Michigan, for Appellant. J. Michael Buckley, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

---

## OPINION

---

BERNICE B. DONALD, Circuit Judge. Sherry Washington appeals her conviction and sentence for money laundering and conspiracy to commit program fraud that arose out of her role in a business venture that ostensibly provided "wellness" services to the Detroit Public School ("DPS") system. We discern no error in the sufficiency of the evidence, and we conclude that Washington was not prejudiced by trial counsel's errors. We also hold that the district court properly enhanced

1

Washington's sentence based on her leadership or organizer role in the conspiracy and based on an amount of loss of at least $2.5 million to DPS. Accordingly, we affirm.

## I.  BACKGROUND

Because the factual nuances assist in our analysis of this appeal, we first review the evidence in detail.

### A.  The Government's Evidence

In 2005, Stephen Hill, the Executive Director of Risk Management for DPS, invited Washington to submit a proposal for implementing a wellness program for DPS employees that would, among other things, use "e-Care" software that Hill had already purchased to generate health assessments for each employee. Washington, along with her friend Sally Jo Bond and her sister Dr. Gwendolyn Washington, then joined Associates for Learning ("A4L"), an entity started by her friend Marilyn White.[1]

On September 6, 2005, A4L submitted a written proposal quoting $150,000 for a pilot study of the "We Care" wellness program that would cover 2,946 employees between November 2005 and March 2006. On the same day, A4L submitted an invoice for $75,000. Hill did not open the program to competitive bidding and the parties signed no written contract even though it was DPS policy to use a bidding process and negotiate written contracts.

On September 10, 2005, Hill left the employ of DPS but continued meeting with Washington to discuss A4L's business with DPS. Christina Polk-Osumah, Hill's former lover and protegee at DPS, requested and approved payment for A4L's first invoice.[2] On October 27, 2005, DPS paid the invoice; the money was distributed to the four partners the next day, with Washington receiving a slightly smaller share. Payment was

---

[1]Marilyn White and Sally Jo Bond both pleaded guilty to conspiracy to commit program fraud pursuant to cooperation agreements.

[2]Polk-Osumah was charged in the original indictment, but the charges were dropped after her death in 2010.

made by wire transfer even though payment by check, which has more safeguards, was normal DPS procedure.

Hill testified that he met with Washington in December 2005 to discuss whether A4L could submit a new and larger invoice. Washington suggested that A4L pay Hill five percent of the invoice amount, an arrangement the government characterized as a "token of appreciation" for Hill's assistance in getting the invoices paid. White and Bond both testified that Washington and Hill had agreed that A4L could submit invoices for $1 million. Both said that they thought this was "too much money" and that they did not think that DPS would pay it.

Nonetheless, A4L submitted a second batch of invoices claiming 3,290 hours of work at $300 per hour, plus $45,000 for "healthy tools," "healthy lunches," and "incentive bonuses" to be provided to DPS employees, for a total of $1,042,000. As Washington admits, the invoices were not for work already performed, but for "future work," but a DPS employee testified that DPS does not normally pay for future services. The government characterized these invoices as fraudulent. White testified that A4L had no system for tracking hours and that the partners simply agreed to bill for a certain number of hours. Bond testified that she did not know the total number of hours spent and a spreadsheet she created for a related civil suit showing hours performed by A4L was "fraudulent." White also testified that the hours on this spreadsheet had perhaps been fabricated, and that the true cost of the "healthy tools" and "healthy lunches" listed in the invoices was not what was billed.

The same day the second batch of invoices was submitted, Polk-Osumah approved a second payment for $967,000. On January 9, the money was again wire transferred to the A4L account, and again, the proceeds were immediately distributed to the four partners. Washington emailed the invoices to Hill, and the remaining $75,000 balance was also wired to the A4L account soon thereafter. Washington sent text messages to her partners instructing them to put five percent of their share in plain white envelopes, in cash, as payment for Hill. Hill testified that Washington directed him to

meet her privately in various public places to deliver the cash, including a public parking garage.

On May 11, 2006, A4L submitted a third batch of invoices—one for $1,095,000, and a second for $1,110,000—but these were not paid immediately. Around June 2006, Hill returned to DPS as an unpaid Acting Executive Director of Risk Management "on loan" from his paid employer, an insurance vendor that contracted with DPS. On August 11, 2006, A4L re-submitted the May invoices. That same day, Hill approved payment. DPS soon wired the full amount in two payments. Again, the money was distributed to the partners; Washington instructed each to give her five percent of their shares, in cash, to pass on to Hill.

In February 2007, A4L received a message from DPS employee Anthony Thornton to "cease going to the schools." A civil suit and a federal criminal investigation against A4L soon followed.

**B. Washington's Rebuttal Evidence**

Washington, her partners, and Hill all testified that the We Care program was a legitimate program. There was also some evidence that A4L completed actual work before DPS halted the program, including making presentations to staff about the health assessment software, distributing flyers, helping a number of teachers complete health assessments, and receiving an assessment of schools that cost the district the most money. A4L also distributed "healthy tools" such as pedometers and healthy lunches, and partners met weekly with DPS staff. Washington organized a "run/walk" event and contacted fitness clubs, and Dr. Gwendolyn Washington produced "Ask the Doctor" videos.

Washington and her partners testified that DPS staff, meaning Hill and Polk-Osumah, knew they were paying for "future work," and that the partners understood advance payments to be standard practice in the Risk Management department of DPS. They also testified that although A4L did not track hours, the partners had a general idea of the number of tasks and the amount of time they spent on those tasks. The partners

and Hill all testified that wire transfers and unwritten contracts were typical in the Risk Management department, and the partners requested a contract but that Hill and Polk-Osumah said they were "working on it."

Finally, Washington claimed that she was misled by Hill, who was involved in a variety of criminal schemes with other DPS vendors. According to her, she was unaware that Hill had returned to work for DPS and she merely paid him a consulting fee for his advice on DPS protocol and on expanding A4L. She also claimed that the fees and cash payments were Hill's idea.

## C. Procedural History

Washington was charged with one count of conspiracy to commit program fraud, in violation of 18 U.S.C. §§ 371 and 666, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956. The jury returned a guilty verdict on both counts. Washington subsequently filed a motion for a new trial on the basis of ineffective assistance of trial counsel. The district court removed Washington's original attorney as counsel but denied the motion.

At the sentencing hearing, the district court enhanced Washington's base offense level by twenty-two levels, finding that Washington was an "organizer or leader" of a criminal activity that involved at least five other people pursuant to Section 3B1.1 of the United States Sentencing Guidelines and that the amount of loss to DPS was over $2.5 million pursuant to Section 2B1.1(b)(1)(J) of the Guidelines. After considering the factors set forth in 18 U.S.C. § 3553(a), the court granted a downward variance for Washington's charitable work and sentenced her to sixty months and eighty-four months, to be served concurrently.

## II. ANALYSIS

## A. Sufficiency of the Evidence Claim

Washington claims that the government did not provide sufficient evidence to support her conviction on either count. When a defendant appeals on the basis that the

evidence was insufficient to support a guilty verdict, our role is to ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). We do not insert our own findings of fact; rather we give full credit to the responsibility of the jury to weigh the evidence, to make credibility determinations, and to draw inferences. *Id.*

To support a jury verdict that Washington was guilty of money laundering under 18 U.S.C. § 1956(a)(1), the government had to provide sufficient evidence that Washington conducted a financial transaction with the intent to carry on a "specified unlawful activity" or with knowledge that the transaction was designed to disguise the nature of the proceeds of a "specified unlawful activity."[3] Washington's sole challenge to the money laundering count is that the evidence is insufficient to prove program fraud, which the parties agree is the relevant underlying "specified unlawful activity" in this case. Therefore, we address only program fraud to resolve Washington's appeal of both counts.

Program fraud occurs where 1) a person who was an agent of a local government agency receiving federal funding over $10,000 per year, 2) embezzled, stole or fraudulently obtained property (including money), 3) the value of which was $5,000 or more, and 4) which was owned or controlled by the government agency. 18 U.S.C. § 666; *United States v. Hudson*, 491 F.3d 590, 593 (6th Cir. 2007). Washington challenges only the second element, arguing that the government did not prove beyond a reasonable doubt that she fraudulently obtained money. However, Washington was not convicted of program fraud itself, but of *conspiracy* to commit program fraud. Thus, the government merely had to prove beyond a reasonable doubt that Washington knowingly and voluntarily joined a conspiracy that intended to fraudulently obtain

---

[3]The full list of elements the government must prove to support a money laundering verdict under 18 U.S.C. § 1956(a)(1) are as follows: 1) the defendant conducted or attempted to conduct a financial transaction, 2) the transaction involved money or property that represented the proceeds of a "specified unlawful activity," 3) the defendant knew that the money was the proceeds of some form of unlawful activity, and 4) the defendant did so with the intent to carry on the "specified unlawful activity" *or* knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the "specified unlawful activity."

money**4** and that a member of the conspiracy took at least one overt act in furtherance of the conspiracy.  *See* 18 U.S.C. § 371.

As we have noted in the past, it can be difficult to obtain direct evidence of something so internal as intent to commit fraud, so if none is available, we have held that juries may consider circumstantial evidence and draw reasonable inferences from such evidence.  *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (drawing inferences from concealment of the activity, misrepresentation, proof of knowledge, and the amount of profit); *see also United States v. Jones*, 641 F.3d 706, 710-11 (6th Cir. 2011) (supporting healthcare and mail fraud convictions with suspicious bills and lack of records for billed services); *United States v. Thompson*, Case No. 09-5181, 2012 U.S. App. LEXIS 19246 at *37-38 (6th Cir. Sept. 11, 2012) (supporting conviction for § 666 fraud with timing of suspect employment relationships between a public agent and private parties, creation of false receipts, and efforts to make a project appear legitimate). Here, the government attempted to prove its case with circumstantial facts, asking the jury to make inferences.

The government provided evidence that 1) A4L billed for work not yet performed and that DPS did not allow such payments; 2) the arrangement was not conducted in accordance with DPS policy and procedure; 3) the invoices submitted over the course of nine months billed for three year's worth of work; 4) A4L did not track hours or keep records of work provided, but billed on an hourly basis; 5) the hours in the invoices were fabricated or at least inflated; 6) at Washington's instruction, A4L made cash payments of tens of thousands of dollars to Hill while he was a DPS insider and personally approving invoices; and 7) A4L immediately distributed almost all the proceeds to the partners instead of maintaining money in the company account to pay for expenses.  A reasonable jury could infer that Washington, or other members of the

---

**4**To obtain something fraudulently means to use misrepresentations or false promises, including statements that are known untruths, statements made with reckless disregard for their truth, half-truths, and the knowing concealment of material facts. 1A Edward J. Devitt et al., *Federal Jury Practice and Instructions*, § 16.08 (6th ed. 2012); *see also Kenty v. Bank One*, 92 F.3d 384 , 389-90 (6th Cir. 1996). The "intent to defraud" is knowingly acting to deceive and is usually accompanied by a purpose to gain personal benefit.  Devitt, *supra*, at § 16.07.

conspiracy, did not bill for actual hour estimates, but for some made up number of hours that would support the dollar amount desired.  It could also infer that Hill used his inside influence to circumvent DPS's normal procedures and that A4L did not perform enough work in the nine months that the We Care program was operational to indicate a legitimate intent to complete the work.  Considering the evidence of Washington's role in generating the invoices, getting the invoices paid, and in making payments to Hill, it was reasonable for a jury to infer her knowledge and intent.

Washington argues that the jury inferred too much from this circumstantial evidence because 1) her business partners did not testify that the invoices were fabricated, 2) billing for future work is not itself fraudulent, and 3) the evidence regarding advance payments, unwritten contracts and wire transfers was insufficient to infer fraud where a member of DPS approved the practices.  However, her partners also testified that A4L did not track hours and that they thought the invoices asked for "too much money."  The invoices were, at a minimum, inaccurate.  And the fact that Hill, himself a member of the alleged conspiracy, approved procedures outside of DPS policy merely supports the inference of deceit and fraud.

Washington also argues that the jury did not give enough credit to 1) her own testimony that the We Care program was legitimate and had performed real work, 2) the testimony of her partners that they intended to perform the work, and 3) her own testimony that she did not know that Hill was still affiliated with DPS when she made the cash payments.  However, it is the job of the jury, not this court, to weigh the credibility of a witness and determine whose story is true. *Jackson*, 443 U.S. at 319.  We will not conduct independent fact-finding where, like here, the jury's findings were reasonable.

Viewed in the light most favorable to the prosecution, the government provided sufficient evidence to support a jury verdict of conspiracy to commit program fraud.  As Washington's objection to the money laundering count was limited to her objection to the underlying "specified unlawful activity" of program fraud, that conviction is also supported.

**B.  Ineffective Assistance of Trial Counsel Claim**

Washington next claims that her trial counsel was ineffective because he failed to present the following exculpatory evidence to the jury: testimony from DPS employee Lamont Satchel about internal DPS practices, character evidence on Washington's volunteerism, and testimony from Kaye Washington that she observed A4L performing genuine wellness work.  All three pieces of evidence were presented after the trial by Washington's new counsel.[5]

Normally, we do not entertain ineffective assistance of counsel claims on direct appeal because of the lack of record evidence bearing on the question.  *United States v. Crowe*, 291 F.3d 884, 886 (6th Cir. 2002).  However, both parties agree that the record below is sufficient in this case because both sides briefed the issue when Washington submitted a motion for a new trial and because Washington has had different counsel since sentencing.  Where the issue is fully briefed and the defendant has new counsel on appeal, we have addressed such claims on direct appeal.  *See United States v. Williams*, 176 F.3d 301, 312 (6th Cir. 1999).  We address it here as well.

We will only find counsel to be constitutionally ineffective if the defendant meets the heavy burden to show that counsel's performance meets both prongs under *United States v. Strickland*, 466 U.S. 668, 687 (1984).  First, counsel's performance must have been deficient due to "errors so serious" that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance."  *Id*. at 687, 690.  Second, the deficient performance must have prejudiced the defense such that there is a reasonable probability that the result would have been different but for counsel's errors.  *Id*. at 687, 694.

While we have no doubt that trial counsel might have done well to present the evidence suggested, we do not conclude that trial counsel's performance was deficient for failing to introduce Satchel's testimony that unwritten contracts and advance

---

[5]Testimony from Satchel was presented with Washington's motion for a new trial.  from Kaye Washington was presented at sentencing.  Evidence on Washington's community involvement was also presented at sentencing.

payments were not unusual in the Risk Management department and that DPS was responsible for producing a contract. This evidence was duplicative of White's and Bond's testimony, and exclusion of it is not outside the bounds of reasonable strategy. *See Strickland*, 466 U.S. at 690-91 (holding that an attorney's strategic decisions "are virtually unchallengeable"). Nor do we conclude that trial counsel was deficient for failing to present character evidence on Washington's reputation for "volunteering tirelessly on behalf of the City's school children." It is not clear that such evidence would have even been admissible under Federal Rule of Evidence ("FRE") 405 because the government did not put Washington's character at issue. However, even if it did, such character evidence is tangential to the question of guilt. Failing to present such evidence is hardly outside the bounds of professional norms.

Trial counsel's failure to present testimony from Kaye Washington, the appellant's sister, is a closer issue. Assuming, however, that trial counsel was deficient for this failure, we do not conclude that the deficiency prejudiced Washington. To find Washington guilty, the jury had to find that, at minimum, the conspiracy intended to do something fraudulent, such as inflating the invoices. Kaye Washington's testimony would have included information on her assessment and strategic planning report of the We Care program and her observations of A4L's genuine wellness work for a one-month period. This could have undermined the government's arguments that A4L did not intend to perform the work billed. However, the testimony regarding the cash payments to Hill and the secrecy surrounding it, which suggested fraudulent activity, was so substantial that Kaye Washington's testimony probably would not have changed the jury verdict. Additionally, Kaye Washington's relationship to the appellant may well have undermined her testimony. Therefore, under *Strickland*, trial counsel cannot be found constitutionally ineffective for this omission. *See also Ross v. United States*, 339 F.3d 483, 495 (6th Cir. 2003) (finding no ineffective assistance for lack of prejudice alone).

## C. Sentencing Enhancement Claims

Washington raises a procedural reasonableness challenge to the district court's sentencing decision, arguing that the court erred by applying two sentencing enhancements. We address each in turn.

### 1.) Organizer or Leadership Role

Washington first challenges the district court's decision to apply the Section 3B1.1(a) enhancement of the Guidelines, adding four levels to her base offense level for her "organizer or leadership role." The standard of review for the decision to apply a Section 3B1.1 enhancement for an organizer or leadership role is unresolved in this circuit. *United States v. Castilla-Lugo*, 699 F.3d 454, 459 (6th Cir. 2012). Traditionally, legal conclusions are reviewed de novo and factual findings are reviewed for clear error. *Id.* However, since the Supreme Court's holding in *Buford v. United States*, 532 U.S. 59, 66 (2001), that review of sentencing enhancements under Section 4B1.2 of the Guidelines is subject to deferential, rather than de novo, review "in light of the fact bound nature of the legal decision," we have repeatedly signaled that the standard of review for Section 3B1.1 is in question. *Id.* (noting that the standard is unresolved and declining to clarify); *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009) (same); *United States v. Moncivais*, 492 F.3d 652, 660 (6th Cir. 2007) (same); *United States v. McDaniel*, 398 F.3d 540, 552 n.10 (6th Cir. 2005) (same); *United States v. Henley*, 360 F.3d 509, 516 (6th Cir. 2004) (same). As the standard of review has been unresolved for over a decade, we take this opportunity to clarify it now.

In *Buford*, the legal question was whether the district court erred in determining that an offender's prior convictions were not "related" enough to be consolidated for sentencing purposes under Section 4B1.2(c) of the Guidelines. 532 U.S. at 60-61. The question was not an underlying factual finding, but rather the legal conclusion that certain prior convictions were not "functionally consolidated." *Id.* at 63. The Supreme Court determined that the district court had certain institutional advantages in resolving the legal question, such as its expertise in classifying prior convictions and its closer

understanding of the factual nuances of the case.  *Id*. at 64-65.  While the legal conclusion that a person is an organizer or leader under Section 3B1.1 is less procedural in nature than the Section 4B1.2(c) question, a Section 3B1.1 enhancement nonetheless depends on a number of factual nuances that a district court is better positioned to evaluate.  The trial judge is most familiar with the facts  and is best situated to determine whether someone is or is not a "leader" of a conspiracy that the jury found existed.  Deferring to this advantage is appropriate.  Accordingly, we hold that, under the reasoning in *Buford*, review of the legal conclusion that a person is an organizer or leader under Section 3B1.1 is also deferential.  *See also United States v. Webb*, 335 F.3d 534, 538 (6th Cir. 2003) (extending the *Buford* deferential standard to review of Section 3E1.1 enhancements).

Having resolved the standard of review, we now turn to the enhancement itself.  Section 3B1.1(a) of the Guidelines calls for a sentencing enhancement when the defendant "was an organizer or leader of a criminal activity that involved five or more participants."  A defendant only needs to be a leader of "one or more other participants" to qualify for the enhancement.  SENTENCING GUIDELINES MANUAL § 3B1.1 cmt. 2; *see United States v. Baker*, 559 F.3d 443, 449 (6th Cir. 2009).  The Application Notes include a non-exhaustive list of factors a court can use to distinguish between one who is an "organizer or leader" from one who is merely a "manager or supervisor" to whom a less severe enhancement would apply: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  SENTENCING GUIDELINES MANUAL § 3B1.1 cmt. 4; *see also id.* § 3B1.1(b) (providing for only a three level enhancement for a "manager or supervisor" of the conspiracy).

The heart of the government's case was a surreptitious arrangement in which Washington suggested, agreed to, and organized surreptitious cash payments to a DPS insider who exerted his influence to get invoices paid—invoices that were at least

inflated at Washington's suggestion. The district court is in the best position to know whether Washington was a leader or organizer under Section 3B1.1 given the evidence presented and the nature of the conspiracy. Any question as to the truth of the evidence is an underlying credibility issue also appropriate for the district court. *See Jackson*, 443 U.S. at 319. While Washington may or may not have been a leader in the *business*, it was not unreasonable for the district court to conclude that Washington was a leader or organizer of the *conspiracy*. SENTENCING GUIDELINES MANUAL § 3B1.1(a) (requiring that the defendant be an organizer or leader "of a criminal activity," here the conspiracy). It may be true that Hill or someone else was also a leader of the conspiracy, but this does not undermine the district court's conclusion because more than one person can be an organizer or leader. *See* SENTENCING GUIDELINES MANUAL § 3B1.1 cmt. 4. Accordingly, we defer to that conclusion.

### 2.) Loss Calculation

Washington next challenges the district court's decision to apply an eighteen-level enhancement under Section 2B1.1(b)(1)(J) of the Guidelines for an amount of loss to DPS of between $2.5 million and $7 million. We review the district court's calculation of the "amount of loss" for clear error, but consider the methodology behind it de novo. *United States v. Poulsen*, 655 F.3d 492, 512-13 (6th Cir. 2011). The prosecution has the burden to prove by a preponderance of the evidence that the enhancement applies. *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003).

The relevant amount of loss for a Section 2B1.1 enhancement is the greater of the actual loss, defined as the reasonably foreseeable pecuniary harm that resulted from the offense, or the intended loss to the victim. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. 3(A). The district court's duty is to make a reasonable estimate of the loss. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. 3(C). However, that loss is to be reduced by the fair market value of actual services rendered to the victim. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. 3(E). Whether the district court appropriately reduced the amount of loss by the value of services provided is the relevant inquiry on appeal.

Washington argued below, as she does here, that A4L performed actual work and that it would have completed the work billed if DPS had not halted the project. The government argued then, as it does now, that though A4L may have performed some tasks, the actual loss to DPS was the entire $3.2 million that it paid to A4L because the entire We Care program was a sham. After hearing both sides, the district court then made the following findings and conclusion:

> The Court finds that there is evidence of more than two and a half million dollars of loss to the public schools through this fraudulent scheme, that no records were kept, there was no contract, there were kickbacks, there was cash, secretive cash, and so for both [Guidelines and restitution] purposes the Court believes that there is more than $2.5 million loss involved in this.

We should note first that the district court did not find that the amount of loss was the entire $3.32 million, but only that the loss was at least $2.5 million, enough to exceed the threshold for the amount of loss range in Section 2B1.1(b)(1)(J). Even so, Washington argues that the court should have reduced the amount of loss further, according to the fair market value of the work A4L performed, which included giving seminars on using the health assessment software to teachers, distributing flyers, and assisting teachers with their health assessments. However, Washington does not explain how the court could have made a more detailed calculation of the value of work performed, given that A4L did not keep records of hours or work completed. The government met its burden to prove that DPS paid $3.32 million to A4L. Counsel for Washington admitted during oral argument that Washington had the burden of proving the specific value by which that amount should be reduced. We agree. The district court's obligation is only to "make a reasonable estimate of the loss" "based on available information . . . as appropriate and practicable under the circumstances." SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. 3(C). Washington provided no estimates of the value of the work completed other than the hourly rates in the invoices that were found to be fraudulent. As a result, the district court was justified in making an estimate based on available information. Indeed, it would have been justified in finding the amount of

loss to be the entire $3.32 million because it found that the entire wellness program was a sham.

Washington also makes an argument that DPS's decision to halt the program was the true proximate cause of the loss because A4L would have otherwise completed the work. This argument is unconvincing. It is reasonably foreseeable that a client who receives fraudulent invoices will eventually terminate the program and, therefore, the fraud is the proximate cause of any loss associated with the termination. The district court did not err in applying this sentencing enhancement.

### III. CONCLUSION

For the foregoing reasons, we affirm Washington's conviction and sentence.