**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0052n.06

No. 18-6078

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

**FILED**
Jan 24, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| MICHAEL MCDONALD, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:    BOGGS, MOORE, and STRANCH, Circuit Judges.

BOGGS, Circuit Judge.   Michael McDonald pled guilty to conspiracy to distribute Oxycodone and possession of Oxycodone with intent to distribute.  The district court sentenced him to 72 months in prison and three years of supervised release.  McDonald appeals his sentence on grounds that the district court erred in applying a sentencing enhancement for being "a manager or supervisor" in the conspiracy and in calculating the quantity of drugs involved in the conspiracy.

## I.  Background

Staying in touch with high school friends is sometimes laudable but not always advisable.  In this case, classmates Andrew Weiss and Kelly Priddy were separated when Weiss moved from Nashville to Detroit with his family, who became part owners of the Detroit Tigers baseball team.  In late 2016, Weiss contacted his former classmate, Priddy, to propose a drug-buying scheme.  Priddy, who had married John Harper earlier that year, used and sold Oxycodone pills with her husband.  Weiss suggested that Priddy and Harper get their pills from McDonald, a large-scale

supplier Weiss knew in Detroit. In January 2017, Priddy and Harper began to get 95 percent of their pills through Weiss, who acted as the middleman between the couple and McDonald. Harper would return to Nashville and distribute some of the pills to a friend, Jason Huddleston, who helped finance the operation and front the pills for distribution. Sometime around June 2017, Harper and McDonald began communicating directly, cutting out the middleman Weiss.

On June 7, 2017, a drug task force raided the home of Harper and Priddy because Harper was on parole from a state sentence. The officers found approximately 93 Oxycodone pills. Harper and Priddy agreed to cooperate with the police to set up a controlled buy with McDonald. But before this could happen, in July Harper failed a drug test and violated his parole. Knowing a warrant had been issued for his arrest, Harper surreptitiously took a trip to Disney World with Priddy because "they wanted a vacation before he went to jail."

Meanwhile, on July 21, 2017, the police, who had been tracking McDonald, located him driving in Nashville, transporting 600 oxycodone pills and $10,000 in cash. McDonald admitted that he purchased pills in Pontiac, Michigan for $16 each from "ordinary Joes" who got prescriptions through their doctors. McDonald said he was going to sell the drugs to an unknown man in Nashville. When the officers looked at McDonald's phone, they saw that a number he had called was Harper's. McDonald agreed to assist the police in catching Harper. McDonald arranged a drug buy at a gas station. At the appointed time, the police saw a white truck that had been observed passing the gas station several times and stopped the truck based on reasonable suspicion from their investigation. Huddleston was driving the vehicle and Harper was in the passenger seat. A search of the truck revealed two handguns, two broken flip phones and $18,000. Harper and Huddleston were arrested. Harper waived his *Miranda* rights and told the police that he had agreed to meet McDonald to buy 600 Oxycodone pills. Harper was charged with a parole

violation and conspiracy to distribute Oxycodone. Huddleston was charged with conspiracy to distribute Oxycodone and possession of a firearm during a dangerous felony. The police released McDonald.

## II. Guilty Plea and Sentencing

On October 25, 2017, Harper, Huddleston, and McDonald were charged in a four-count indictment. McDonald was charged in Count One, alleging a conspiracy to distribute Oxycodone, in violation of 21 U.S.C. § 846, and Count Two, alleging possession of Oxycodone with intent to distribute, in violation of 21 U.S.C. § 846. Huddleston and Harper pled guilty to other charges and, in their plea agreements, they each stated that they had purchased at least 8,000 Oxycodone pills from McDonald. McDonald pled guilty but did not enter into a plea agreement. At his plea hearing, the factual basis for his plea included statements from both Harper and Huddleston admitting that between January 2017 and July 2017 they had received at least 8,000 Oxycodone pills from McDonald. McDonald did not object, or dispute the factual basis of his charges.

The Presentence Investigative Report, relying on the statements of Harper, Huddleston, and McDonald, concluded that Harper made trips to Michigan every three to four weeks and purchased between one and two thousand pills each time. Harper made at least seven of these trips. The PSR estimated that the pills were 30 milligrams each, so the conspiracy resulted in distribution of at least 8,000 30-milligram Oxycodone pills.

The PSR calculated that McDonald had zero criminal history points, establishing a Criminal History Category of I. The PSR recommended that McDonald receive a four-level enhancement under U.S.S.G. § 3B1.1 as "an organizer or leader" of criminal activity involving five or more people. McDonald objected to this and to the PSR's drug-quantity calculation. The district court rejected the four-level leader/organizer enhancement and instead found that

McDonald was only a "manager or supervisor," which carries a lesser, three-level, enhancement. Based on the criminal history, drug quantity, and enhancement, these findings yielded an offense level of 30 and a guidelines sentence range of 97 to 121 months. The judge varied downward based on McDonald's age, employment record, remorse, non-violent offender status, history of drug and alcohol dependence, and acceptance of responsibility. The judge sentenced McDonald to 72 months in prison and three years of supervised release. McDonald appealed.

## III.    Standard of Review

We review the district court's factual findings underlying a § 3B1.1 enhancement for clear error, while we review the legal conclusion that a person is an organizer or a leader under a deferential standard as set forth in *Buford v. United States*, 532 U.S. 59 (2001) because such enhancement "depends on a number of factual nuances that a district court is better positioned to evaluate." *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013). "The trial judge is most familiar with the facts and is best situated to determine whether someone is or is not a 'leader' of a conspiracy that the jury found existed. Deferring to this advantage is appropriate." *Ibid*. We also review a district court's drug-quantity determination for clear error. *United States v. Valentine*, 553 F. App'x 592 (6th Cir. 2014). The district court's decision must be upheld if it is plausible in light of the entire record. *United States v. Dixon*, 262 F. App'x 706, 710 (6th Cir. 2008).

## IV.    Role Enhancement

The sentencing guidelines provide for an offense-level enhancement when a defendant plays an "aggravating role" in the criminal activity. U.S.S.G. § 3B1.1. If a defendant is considered "an organizer or leader" of a criminal activity that involved five or more participants,[1] he is subject

---

[1] There is no dispute that the criminal activity in this case involved five or more people.

to a four-level increase. But if a defendant is considered only "a manager or supervisor" of a criminal activity, he is subject to a three-level increase. The sentencing guidelines do not define the terms, organizer, leader, manager, or supervisor, but two Application Notes to § 3B1.1 are instructive.

Originally, courts applied the aggravating-role enhancement under § 3B1.1 to both individuals who had decision-making authority over other participants in a criminal activity and individuals who had leadership over the "criminal enterprise or organization." *United States v. Paulino*, 935 F.2d 739, 757 (6th Cir. 1991). But, "[i]n November 1993, Application Note 2 of the commentary to § 3B1.1 was amended to clarify the intended reach of § 3B1.1." *United States v. Caseslorente*, 220 F.3d 727, 734 (6th Cir. 2000). The Application Note provides:

> To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor *of one or more other participants*. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise *another participant*, but who nevertheless exercised management responsibility over the *property, assets, or activities of a criminal organization.*

U.S.S.G. § 3B1.1, cmt. n.2 (emphasis added); *see also United States v. Gort-DiDonato*, 109 F.3d 318, 321 (6th Cir. 1997). In *United States v. Kamper*, we stated that "[t]o qualify for [an enhancement under U.S.S.G. § 3B1.1(b)], a defendant must have managed or supervised 'one or more other participants,' and not merely the criminal scheme." *United States v. Kamper*, 748 F.3d 728, 748 (6th Cir. 2014) (citing U.S.S.G. § 3B1.1(b) cmt. n.2). *See also United States v. Galvan*, 453 F.3d 738, 743 (6th Cir. 2006) (upholding role enhancement where the defendant "exercised a degree of control or authority over others within the conspiracy."). The exercise of decision making authority over other participants is necessary to qualify for a sentencing enhancement under this section. On the other hand, a mere buyer-seller relationship does not make one of the

participants a leader/organizer or a manager/supervisor even if one of them fronts drugs to the other. *United States v. Ward*, 37 F.3d 243, 247–48 (6th Cir. 1994).

In this case, McDonald's guideline range depends in part on whether he was a leader/organizer, manager/supervisor, or neither. Application Note 4 of the commentary to § 3B1.1 sets out the factors courts should consider in distinguishing a leader/organizer from a manager/supervisor:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4.

The district court heard argument on this somewhat nebulous distinction between the greater enhancement for a leader/organizer and the lesser enhancement for a manager/supervisor and found that McDonald was a manager/supervisor subject to a three-level enhancement. The district court stated:

> In terms of his leadership role, it seems to me that four is too high for him. He was the supplier for Harper. But he didn't direct anything about Mr. Huddleston. We have no evidence that he really directed the people that he was buying the pills from up in Detroit. If they willingly sold them to him, he's not directing their activity. So I find that plus three instead of plus four is a more accurate leadership role for him as a manager or supervisor, but not an organizer or leader.

While the record may support the finding that the "more accurate leadership role" for McDonald was a manager or supervisor, the district court did not ground its decision for the enhancement in the necessary factual finding that McDonald managed or supervised other people. And, as discussed above, the court's finding that McDonald was the "supplier" for Harper, which suggests a seller-buyer relationship, does not automatically support a finding that he managed or supervised the actions of Harper or any other person. The district court abused its discretion in finding that

McDonald was a manager or supervisor in the conspiracy because it did not make the proper factual findings to support the enhancement in light of the relevant legal standard.

## V.     Calculation of Drug Quantity

McDonald argues that the district court clearly erred in finding him responsible for distributing 8,000 30-mg Oxycodone pills.  A finding of fact is clearly erroneous only when, reviewing the entire evidence, the court is "left with the definite and firm conviction that a mistake has been committed."  *United States v. Vasquez*, 352 F.3d 1067, 1070 (6th Cir. 2003).  We have no such conviction here.  McDonald argues that he should have been sentenced based only on the number of pills seized from him, which was 600 pills with mixed dosages of 15 and 30 mg.  This number would have resulted in a base offense level of 22 rather than 30.

This circuit has held that that quantities of drugs that are not part of the count of conviction "may be included in determining the base offense level as long as the drugs were 'part of the same course of conduct or common scheme or plan as the offense of conviction."  *United States v Robison*, 904 F.2d 365, 371 (6th Cir. 1990) (citation omitted).  But the facts used to calculate that number must have "some minimum indicium of reliability beyond mere allegation."  *Ibid*.  In *Robison*, calculation of drug quantities was found unreliable because it was  based on the uncorroborated  testimony of a witness who was using cocaine daily, suffered from periodic blackouts, suffered a general lack of memory, and gave vague recollections when pressed into giving an estimate of the amount drugs. *Ibid*.

Here, co-conspirators Harper and Huddleston both testified in their plea agreements to the same number —8,000 pills—even though, as the court noted, they had a motivation to understate the amount in order to reduce their own sentences.  The district court heard testimony about the quantities and types of drugs sold by McDonald.  Huddleston testified to the 8,000-pill amount

again under oath and the district court found him to be a credible witness. And the quantity of drugs was consistent with the PSR. The district court did not commit clear error in its calculation of drug quantities.

## VI.

For the above stated reasons, we AFFIRM the district court's drug-quantity calculation. We VACATE the sentence enhancement and REMAND for additional fact finding and legal analysis regarding the § 3B1.1 enhancement.