NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0354n.06

No. 22-1998

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 03, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| BRYAN ALAN KENNERT, | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

**Before: STRANCH, BUSH, and MURPHY, Circuit Judges.**

The court delivered a PER CURIAM opinion. MURPHY, J. (pp. 9–12) delivered a separate concurring opinion, in which BUSH, J., joined.

PER CURIAM. Bryan Kennert sold a couple some $43,000 worth of counterfeit baseball cards. He pleaded guilty to wire fraud. To determine Kennert's guidelines range, the district court needed to calculate the amount of the "loss" from his offense. U.S.S.G. § 2B1.1(b)(1). The *actual loss* was easy to identify: the $43,000 or so that he took from his victims. But the police also uncovered many other fake cards in his home, including a Babe Ruth card that, if genuine, would have been worth millions. The district court found that Kennert planned to sell these other cards for over $1 million. It relied on this much larger *intended loss* to increase his guidelines range.

Kennert claims that § 2B1.1 required the district court to use the actual loss—not the intended loss—to calculate the loss amount. He also claims that the district court's valuation of

the counterfeit cards found at his home rested on rank speculation. But we recently rejected his legal argument that § 2B1.1 bars courts from relying on intended loss. *See United States v. You*, __ F.4th __, 2023 WL 4446497, at *12–13 (6th Cir. July 11, 2023). And the district court's valuation finds firm support in the opinions of a trading-card expert. We thus affirm.

I

Kennert sold trading cards from a booth that he leased in the Anything and Everything Antique Mall in Muskegon, Michigan. On a day that Kennert was away from his booth, a married couple stopped by in search of rare baseball cards. They left their contact information, and Kennert later connected with them via text and telephone. He told the couple that he had once operated a baseball-card store but had grown tired of the business and placed most of his inventory in storage. He suggested, though, that he still had plenty of rare packs of cards.

After researching some of the packs that Kennert claimed to own, the couple learned that he offered to sell them at prices well below their market rates. Between April and October 2019, they chose to buy many packs from Kennert on eight occasions. These eight transactions ranged in price from $31.80 to $14,840 and had a total value of over $43,000.

Yet the couple soon grew suspicious of the authenticity of the packs they bought from Kennert. Among other reasons, a Michael Jordan rookie card from one pack was too large to fit in a standard-size protective case. So the couple asked two appraisers to value the cards. To their chagrin, each expert identified the cards as counterfeit. One appraiser further opined that the cards would have been worth about $200,000 if they had been genuine.

The couple complained about Kennert to law enforcement. After an investigation, federal authorities searched his home. Their search turned up many other counterfeit trading cards. Of most note, Kennert possessed a fake 1916 Babe Ruth card.

2

Ultimately, a grand jury indicted Kennert on eight counts of wire fraud—one count for each transaction with his victims. Kennert pleaded guilty to all eight counts without a plea agreement.

Before Kennert's sentencing, a probation officer prepared his presentence report. Under the relevant guideline, his total offense level for the fraud depended on the amount of the "loss." *See* U.S.S.G. § 2B1.1(b)(1). A loss of $43,000 (the approximate amount that Kennert's victims had paid for the fake packs) would have increased his offense level by 6 levels. *Id.* § 2B1.1(b)(1)(D). Based on the guideline's commentary, however, the presentence report suggested that the district court should hold Kennert responsible for the "intended loss" from the counterfeit cards found at his home. To calculate this intended loss, the government retained a trading-card expert from a retailer named the Baseball Card Exchange. This expert opined that these cards (if they had been genuine) would have had a market value of nearly $4.36 million. Kennert had sold other counterfeit cards for about 25% of their actual (if genuine) value. The presentence report thus recommended that the court use this percentage. The report calculated the intended loss from the cards at Kennert's house as $1.09 million (25% of $4.36 million). This larger loss amount increased Kennert's offense level by 14 levels. *Id.* § 2B1.1(b)(1)(H). It also produced a guidelines range of 27 to 33 months' imprisonment. If the presentence report had relied only on the actual loss, by comparison, Kennert's guidelines range would have dropped to 8 to 14 months' imprisonment.

Kennert raised legal and factual objections to the presentence report's use of the greater loss figure. Legally, Kennert argued that the relevant fraud guideline required the court to calculate his offense level using only the *actual loss* to his victims and not the *intended loss* to unknown parties. Although this guideline's commentary directed the court to include the intended loss,

Kennert further asserted, the court must disregard this commentary because it conflicted with the unambiguous text of the guideline itself.

Factually, Kennert argued that the presentence report's estimation of the amount of the loss from the cards at his home ($1.09 million) was "speculative[.]"  PSR, R.31, PageID 125.  In response, the government produced a second valuation report from its expert at the Baseball Card Exchange that now valued the cards at a much larger number—about $7.33 million.  At a forfeiture hearing, this expert testified that he chose the larger number after spending significantly more time researching the valuations.  That said, the government recommended that the district court stick with the expert's initial (lower) number because Kennert may have relied on it when pleading guilty.

At sentencing, the district court rejected both of Kennert's arguments.  The court held that the commentary permissibly interpreted the fraud guideline to require courts to use a defendant's intended loss (not just the victim's actual loss) when calculating the defendant's guidelines range. It next found that the presentence report reasonably estimated the amount of Kennert's intended loss by relying on the expert's initial loss number.  The court sentenced Kennert to 30 months' imprisonment.

II

On appeal, Kennert raises the same legal and factual challenges to the presentence report's calculation of the "loss" that he asserted in the district court.  But our recent precedent requires us to reject his legal argument, and our standard of review requires us to reject his factual one.

A. *The Legal Issue: Does the fraud guideline allow district courts to increase a defendant's offense level based on the amount of the defendant's "intended loss"?*

The fraud guideline instructs courts to increase a defendant's offense level based on the amount of the "loss."  U.S.S.G. § 2B1.1(b)(1).  The relevant paragraph starts with this sentence:

"If the loss exceeded $6,500, increase the offense level as follows[.]" *Id.* It then requires larger and larger increases to the offense level as the "loss" from the offense rises. *Id.* So a loss of "[m]ore than $40,000" (but less than "$95,000") generates an offense-level increase of 6, whereas a loss of "[m]ore than $550,000" (but less than "$1,500,000") generates an offense level increase of 14. *Id.* § 2B1.1(b)(1)(D), (H). Critically, however, this guideline nowhere defines the key word "loss." *See United States v. Riccardi*, 989 F.3d 476, 486 (6th Cir. 2021).

The commentary to the guideline attempts to fill in this gap. It provides pages of substantive instructions on how to calculate the loss in various circumstances. As relevant here, the commentary defines "loss" to mean the "greater of actual loss or *intended loss*." U.S.S.G. § 2B1.1, cmt. n.3(A) (emphasis added). It then defines "intended loss" to "mean[] the pecuniary harm that the defendant purposely sought to inflict," including even "intended pecuniary harm that would have been impossible or unlikely to occur[.]" *Id.* § 2B1.1, cmt. n.3(A)(ii).

The Sentencing Commission's choice to put these instructions in the commentary—rather than the guideline—has repercussions for our review. We do not automatically defer to the commentary because of the way that the Commission may change it. To amend a guideline, the Commission must use notice-and-comment rulemaking and give Congress a potential veto. *See United States v. Havis*, 927 F.3d 382, 385 (6th Cir. 2019) (en banc) (per curiam). But the Commission need not follow these procedural protections for the commentary. *See id.* at 386. These differences have led the Supreme Court to analogize the Commission's commentary to an executive agency's informal interpretation of its substantive regulations. *See Riccardi*, 989 F.3d at 484 (discussing *Stinson v. United States*, 508 U.S. 36 (1993)). Under that analogy, the Commission may use its commentary to *interpret* an ambiguous guideline that is susceptible to a range of meanings, but it may not use the commentary to *amend* a clear guideline that has only

5

one meaning. *See Havis*, 927 F.3d at 386. As we have explained, therefore, we will defer to the commentary's interpretation of a guideline only if the guideline's text is "genuinely ambiguous" and only if the commentary's reading "falls 'within the zone of [any] ambiguity'" that we find in the text. *Riccardi*, 989 F.3d at 486 (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414, 2416 (2019)).

Applying these rules here, Kennert argues that no reasonable person would interpret the word "loss" in § 2B1.1 to mean "intended loss." According to Kennert, "loss," when used by itself, unambiguously refers to an actual loss that happened in the real world, not a hypothetical loss that a person sought to bring about. Unfortunately for Kennert, we recently rejected his argument. *See You*, 2023 WL 4446497, at *12–13. In *You*, we held that a "genuine ambiguity exists" in the meaning of the word "loss" in § 2B1.1. *Id.* at *12. We added that the commentary's reading (that "loss" means "intended loss") fell "within the zone of ambiguity" that we saw. *Id.* at *13 (quoting *Kisor*, 139 S. Ct. at 2416). To his credit, Kennert filed a supplemental letter conceding that *You* binds the panel at this stage. We thus must reject his legal argument.

B. *The Factual Issue: Did the district court reasonably estimate the value of the trading cards found in Kennert's home?*

To increase a defendant's offense level, the government bears the burden of establishing the amount of a defendant's intended loss. *See United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013). In many cases, however, a district court will struggle to pinpoint the specific amount of this loss. *See, e.g.*, *United States v. Ellis*, 938 F.3d 757, 760 (6th Cir. 2019) (citing *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013)). So a district court need only make a "reasonable estimate" of this amount. U.S.S.G. § 2B1.1, cmt. n.3(C). We treat the court's general formula for calculating a defendant's loss amount as a legal question reviewed de novo. *See Washington*, 715 F.3d at 984. But we treat the court's application of this formula to the facts of the defendant's case as a factual question reviewed for clear error. *See id.* This clear-error

standard requires us to defer to the district court's findings so long as they are "plausible" on the record as a whole. *United States v. Estrada-Gonzalez*, 32 F.4th 607, 614 (6th Cir. 2022).

Kennert's arguments cannot overcome this deferential standard of review. He does not challenge two of the district court's key findings. To begin with, he does not dispute the court's factual finding that he intended to defraud other victims in the future by selling the remaining counterfeit cards discovered in his home. Next, he does not dispute the court's general "methodology" for calculating his intended loss. *Washington*, 715 F.3d at 984. Because Kennert sold other counterfeit cards at about 25% of their actual value, the district court applied the same 25% discount rate to all of his cards. (It may well be a stretch to think that someone perusing the Anything and Everything Antique Mall would shell out $1 million for a Babe Ruth card without any due diligence. But again, Kennert does not challenge this 25% discount rate. And besides, the commentary requires courts to include even intended harms that were "unlikely to occur[.]" U.S.S.G. § 2B1.1, cmt. n.3(A)(ii).)

Kennert instead challenges only the district court's resolution of a purely factual question: What would have been the market value of his counterfeit cards if they had been real? Contrary to Kennert's argument, the district court had a "plausible" basis in the record for its estimate of the cards' worth—the opinion of the expert from the Baseball Card Exchange. *Estrada-Gonzalez*, 32 F.4th at 614. The court chose to use this expert's initial valuation report, which estimated the cards' value at $4.36 million. PSR, R.31, PageID 108; Initial Valuation Report, R.39-1, PageID 165–66. Most of this amount resulted from the Babe Ruth card, which had an estimated value of $4 million. Initial Valuation Report, R.39-1, PageID 165–66.

In response, Kennert nitpicks the expert's initial valuation. The expert's report lumped together hundreds of fake packs from between 1974 and 1982 and estimated their total value at

$20,000. *Id.*, PageID 165. It also lumped together "many more" individual cards and estimated their value at $100,000. *Id.*, PageID 166. And it valued the Babe Ruth card without using any of the "comps" (recent transactions involving comparable cards) that the expert used to value many of Kennert's other cards in his second valuation. Kennert claims that the expert's conclusory valuations for these three sets of cards do not suffice. Yet he presented no specific evidence that called into question the expert's valuation of the cards. Nor did he ask the expert about them at the forfeiture hearing. *Cf. United States v. Poulsen*, 655 F.3d 492, 513 (6th Cir. 2011). The expert's second valuation also provided significantly more detail—and a significantly larger estimate of the cards' worth. So more detail may well have worked to Kennert's detriment in the event of a remand. And although the expert's second valuation still lacked any "comps" for the Babe Ruth card, Kennert did not offer any "comps" of his own. Besides, million-dollar transactions involving rare baseball cards are themselves likely a rarity. At day's end, while "more specificity" would have bolstered the expert's initial opinion, *United States v. Nicolescu*, 17 F.4th 706, 721 (6th Cir. 2021), his opinion still provided a "plausible" basis for the court's estimates, *Estrada-Gonzalez*, 32 F.4th at 614. Our deferential standard of review requires nothing more.

We affirm.

MURPHY, Circuit Judge, concurring. Bryan Kennert may well have to spend many more months in prison because the Sentencing Commission's commentary suggests that the word "loss" in U.S.S.G. § 2B1.1(b)(1) can include a defendant's "intended loss." *Id.* § 2B1.1, cmt. n.3(A). I concur in the decision to uphold Kennert's sentence because we must follow our precedent holding that "loss" can reasonably mean "intended loss" even when unadorned by that adjective. *See United States v. You*, __ F.4th __, 2023 WL 4446497, at *12–13 (6th Cir. July 11, 2023). But make no mistake, I find this interpretation implausible. If considering this question from scratch, I would have agreed with the views of our colleagues on the Third Circuit. *See United States v. Banks*, 55 F.4th 246, 255–58 (3d Cir. 2022). "Loss" means "loss."

Start with the text. No speaker versed in the English language would say that "the loss" from a fraudster's conduct "exceeded $6,500" if the speaker really meant to convey that the fraudster intended—but failed—to cause that loss. U.S.S.G. § 2B1.1(b)(1). Rather, anyone who heard this phrase would presume that the speaker was referring to the damage that resulted from the crime. That is because this word, when used alone, refers to the "amount lost," not the amount almost lost or intended to be lost. *United States v. Riccardi*, 989 F.3d 476, 486 (6th Cir. 2021) (quoting dictionaries); *see also Banks*, 55 F.4th at 257–58 (same). Frankly, I find the phrase "actual loss" redundant (sort of like "minor modification" or "necessary requirement"). *Cf. MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 227 (1994). The phrase is useful only if a speaker seeks to contrast a fulfilled harm with something else (such as a barely avoided one).

*You* found the word ambiguous by pointing to our prior suggestion that the meaning of "loss" can vary on the margins. *See* 2023 WL 4446497, at *12. The word might cover emotional harms, economic harms, or both. *See Riccardi*, 989 F.3d at 486. But just because "loss" can refer to these different harms does not mean that it can refer to nonexistent ones too. That is why the

Supreme Court has held that an agency's reading does not get deference just because a regulation is ambiguous. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–16 (2019). The agency's reading must also fall "within the zone of ambiguity" that a court identifies. *Id.* at 2416. And here, *You* points to no linguistic source that plausibly suggests that loss can mean "intended loss." Hence why the adjective is necessary. One wonders what other adjectives might now fall within the capacious zone of ambiguity that *You* has found. If a victim mistakenly believes to have lost $1 million, can this "imagined loss" increase a defendant's guidelines range under § 2B1.1 too? Or how about if the government merely accuses the defendant of causing $1 million in harm. May it rely on this "alleged loss" alone to increase the guidelines range without the pesky burden to offer proof?

Nor do I see anything in the "context and purpose" of § 2B1.1 that justifies *You*'s reading. 2023 WL 4446497, at *12. As far as I can tell, *You* does not even make a "context" argument. That is, the opinion does not ask how the word "loss" fits within the guidelines as a whole. *Cf. Biden v. Nebraska*, 143 S. Ct. 2355, 2378–79 (2023) (Barrett, J., concurring).

Rather, *You* relies only on a "purpose" argument. And it discovers the guideline's purpose from other commentary rather than from the guideline itself. *You* suggests that § 2B1.1 requires a court to measure the loss from the crime to identify a defendant's moral culpability. 2023 WL 4446497, at *12. It adds that a person who intends to cause a loss is just as culpable as someone who successfully causes one, so the two people should be treated the same. *Id.* (quoting U.S.S.G. § 2B1.1 cmt. (background)). I fail to see how we can use one piece of commentary to find an ambiguity in the guideline in order to uphold another piece of commentary. That circular approach resembles the forbidden practice of using legislative history to create ambiguity in an unambiguous statute. *See Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011).

*You*'s policy judgment is also not free from debate. Is Bryan Kennert (who merely possessed a fake Babe Ruth card) equally culpable to a defendant who used the same fake card to successfully swindle victims out of $1 million? The answer to this moral question is not as obvious to me as it was to *You*. Regardless, the Commission must make this sort of "substantive policy choice" in the guideline itself, not in the commentary. *Riccardi*, 989 F.3d at 487.

If anything, the broader context supports the ordinary meaning of the word "loss." The Commission knows how to put incomplete harms in the guidelines. A separate guideline covers attempt offenses. *See* U.S.S.G. § 2X1.1. This attempt guideline instructs courts to use "[t]he base offense level from the guideline for the substantive offense" and to add any offense-level "adjustments from such guideline for any *intended* offense conduct that can be established with reasonable certainty." U.S.S.G. § 2X1.1(a) (emphasis added). So a district court may well look to the intended loss for somebody who committed, say, attempted wire fraud. *See* 18 U.S.C. § 1349. Here, for example, if the district court had found that Kennert completed the crime of *attempted* wire fraud through his possession of other counterfeit cards, perhaps the court could have treated this other "criminal conduct" as "relevant conduct" under U.S.S.G. § 1B1.3. *United States v. Catchings*, 708 F.3d 710, 720 (6th Cir. 2013). And perhaps it then could have relied on § 1B1.3 or § 2X1.1—not an atextual reading of the word "loss"—to consider Kennert's intended loss. But the court did not ask whether Kennert committed attempted wire fraud with his other counterfeit cards. It instead short-circuited that process by holding that loss means intended loss.

Our precedent also supports the ordinary meaning. *See United States v. Havis*, 927 F.3d 382, 386–87 (6th Cir. 2019) (en banc) (per curiam). In *Havis*, we interpreted the definition of "controlled substance offense" in the career-offender guidelines. *Id.* Because this definition covered only completed drug crimes (such as the "manufacture" of drugs), we refused to read it to

11

include *attempt* crimes. *Id.* at 384 n.1, 386–87. This logic applies here. Just as "manufacture" does not mean "attempted manufacture," so too "loss" does not mean "intended loss."

In effect if not in name, *You* rejuvenates our prior practice of "reflexively" deferring to the Commission's commentary with barely any effort to interpret the guideline. *Riccardi*, 989 F.3d at 484–85. In that respect, it continues a recent trend of decisions that uphold implausible "interpretations" of guidelines. *See, e.g.*, *United States v. Phillips*, 54 F.4th 374, 380–86 (6th Cir. 2022); *United States v. Tate*, 999 F.3d 374, 380–81 (6th Cir. 2021). As Judge Larsen has opined, "old habits are hard to break." *Phillips*, 54 F.4th at 386 (Larsen, J., concurring in the judgment).

Perhaps our rejuvenation of reflexive deference flows from a concern that the commentary brims with implausible readings of guidelines provisions. That may be true. But the Sentencing Commission can readily fix this problem. The Commission typically follows the same notice-and-comment procedures for its commentary that it uses when enacting the guidelines themselves. *See, e.g.*, *Riccardi*, 989 F.3d at 488–89; *see also United States v. Dupree*, 57 F.4th 1269, 1280–82 (11th Cir. 2023) (en banc) (Pryor, C.J., concurring). It need only ensure that this commentary makes its way into the guideline. *See Dupree*, 57 F.4th at 1281–82 (Pryor, C.J., concurring). Until it does, however, criminal defendants have the same right to an Article III court's independent judgment that civil litigants possess. And if, say, the EPA had adopted the Commission's reading of the word "loss" in an environmental regulation governing private parties, I very much doubt we would have upheld that interpretation under the Supreme Court's recent clarifications of so-called "*Auer*" deference. *See Kisor*, 139 S. Ct. at 2414–18. *You* should have reached the same result.